WILLIAM R. HALLETT AND ROBERT L. WALKER, EXECUTORS OF JOSHUA KENNEDY, DECEASED, JOHN G. AIKIN AND CLARISSA HIS WIFE, JOHN H. HASTIE AND HIS WIFE SECLUDA, AUGUSTUS R. MESLIER AND HIS WIFE, MARY AUGUSTA KENNEDY, JOSHUA KENNEDY, JAMES INERARITY, SAMUEL KITCHEN, WILLIAM KITCHEN, JAMES CAMPBELL, AND THE BRANCH BANK OF THE STATE OF ALABAMA AT MOBILE, APPELLANTS, v. SIDNEY E. COLLINS.

In order to constitute a valid marriage in the Spanish colonies, all that was necessary was that there should be consent joined with the will to marry.

The Council of Trent, in 1563, required that marriage should be celebrated before the parish or other priest, or by license of the ordinary and before two or three witnesses. This decree was adopted by the king of Spain in his European dominions, but not extended to the colonies, in which the rule above mentioned, established by the Partidas, was permitted to remain unchanged.

An ecclesiastical decree, *proprio vigore*, could not affect the *status* or civil relations of persons. This could only be effected by the supreme civil power.

In 1803, Collins obtained from the military commandant at Mobile a permit to take possession of a lot of ground near that place, and made a contract with William E. Kennedy that the latter should improve it, so as to lay the foundation for a perfect title, and then they were to divide the lot equally.

Kennedy's ownership of a hostile claim, whether held then or acquired subsequently, enured to the joint benefit of himself and Collins; and when Kennedy obtained a confirmation of his title under the acts of the commissioners appointed under an act of Congress, he became a trustee for Collins to the extent of one half of the lot.

The deeds afterwards made by Kennedy, under the circumstances of the case, did not destroy this trust; but the assignee, having full knowledge of the trust, must be held bound to comply with it.

This assignee obtained releases, for an inadequate consideration, from the heirs of Collins, who had just come of age, were poor, and ignorant of their rights. These releases were void.

Before Kennedy conveyed to the assignee just spoken of, he had conveyed the property to another person who held it as a security for a debt; and who, when the debt was paid, transferred it to the same assignee to whom Kennedy had conveyed it. This added no strength to the title, but only gave to this assignee a claim to be reimbursed for the money which he paid to extinguish the debt.

The absence of the complainant from the State, and the late discovery of the fraud, account for the delay and apparent laches in prosecuting his claim.

THIS was an appeal from the Circuit Court of the United States for the Southern District of Alabama.

The controversy had its origin in transactions long anterior

to the acquisition of the country by the United States, and involved also the discussion of events long afterwards; so that the case became very complicated, and the record voluminous. Being an appeal in chancery, all the evidence was brought up to this court. Instead of giving a narrative of the case, it appears best to set forth the grounds of complaint in the bill, and of defence in the answer.

The defendant in error, Sidney E. Collins, was complainant below in a bill in equity against the heirs and executors of Joshua Kennedy, deceased, and others. The bill sets forth that the complainant is both heir and devisee of his late father, Joseph Collins, and sole heir-at-law of his deceased brothers George and Joseph, the co-heirs and co-devisees with himself of his father's estate. That Joseph Collins, his father, had obtained a grant of a certain lot of land from the Spanish government, in or near the city of Mobile. That William E. Kennedy claimed an interest in the same lands, through a grant to one Alexander Baudain. That on the 21st of November, 1806, Collins and Kennedy entered into an agreement to divide the land between them; Kennedy to have the northern half, and Collins the southern; Kennedy covenanting " to improve the lot by fencing and ditching so that it might not be forfeited." That, in pursuance of this agreement, Kennedy held possession of the lot, and made the necessary improvements, during the time that Spain held possession of the territory. That when it came into possession of the United States, the Collins and Baudain permits or claims were both laid before the commissioners. That the first report of Mr. Crawford, the commissioner, was unfavorable to both. That Collins being at this time dead, his claim was not revived by Kennedy, but it was renewed under the Baudain grant alone, and in July, 1820, a favorable report was made in favor of Kennedy in virtue of the Baudain grant, and the legal title confirmed in him by the act of the 8th of May, 1822. That in the mean time, to wit, on the second day of March, 1820, a deed was made by W. E. Kennedy reciting the original agreement between Collins and himself, and conveying the southern half of the lot to James Inerarity, the administrator of Collins, for the use of the estate, with a covenant for further assurance to Inerarity or the heirs of Collins, on the issuing of the patent for the land. The bill also charges, that about this time W. E. Kennedy became very intemperate; that his brother Joshua, who had unbounded influence over him, and was a witness to the deed to Inerarity, and acquainted with the title of Collins's heirs in the property, contrived a scheme to defeat it and defraud the heirs. That in pursuance thereof he obtained a deed from W. E. Kennedy to

Samuel Kitchen, his father-in-law, for the Collins half of the lot, antedated so as to appear to be prior in date to the deed to Inerarity. That Joshua Kennedy transacted the business in Kitchen's name, at first without his (Kitchen's) knowledge, and paid the consideration, if any was paid, and afterwards took a transfer from Kitchen to himself, for a nominal consideration. That in 1824, in further pursuance of the same scheme, he procured a deed from W. E. Kennedy for all his property, and, among other things, a claim or grant from the Spanish government to one Price, of a very suspicious character, which had been rejected by the commissioners. That having succeded in obtaining a confirmation of the Price claim in 1829, he surveyed it over the claim of Baudain previously confirmed to W. E. Kennedy in right of Baudain, in 1822, and took a patent under it. That this was done for the purpose of complicating the title and defrauding the heirs of Collins. The bill charges, also, that Joshua Kennedy, in further prosecution of this scheme, had certain proceedings entered on the docket of the Circuit Court of Mobile in the name of William Kitchen against James Inerarity, and, without bill, answer, or pleadings of any kind to furnish any key to the claim of Kitchen, a decree was entered, in pursuance of which Inerarity made a deed to Kitchen for the Collins half of the land, in consideration of Kitchen paying to him a debt claimed by Forbes & Co. (of which firm Inerarity was a partner) against Collins's estate, amounting to the sum of $ 2,233 ; the property conveyed being then worth $ 75,000, and now $ 200,000. That having thus complicated the title of the heirs of Collins to the land in dispute, Joshua Kennedy applied to George and Sidney E. Collins, the heirs, as soon as they came of age, representing that their claim was of no value whatever, and utterly hopeless, but that, for the sake of peace and quieting his title, William Kitchen was willing to give them each the sum of $ 1,000. That by means of these fraudulent misrepresentations he obtained deeds from them to Kitchen releasing their claims. That William Kitchen was a brother-in-law of Joshua Kennedy, and a young man without means residing in the family of Kennedy, and his name was used by him for a cover; and that he took a conveyance from Kitchen as soon as the complete title was supposed to be thus fully vested in him by these fraudulent schemes and contrivances.

The bill prays for a conveyance of the land, and an account of rents and profits.

The matters of defence set forth in the several answers of the defendants, and relied upon in the argument of the case, were substantially as follows :—

1. That the will of Joseph Collins was not properly proved.

2. That the complainant and his brothers were illegitimate, and therefore incapable of inheriting from their father or from one another.

3. That Collins had no valid claim to the property. That his concession was abandoned after its rejection, and no possession ever taken under it, nor any attempt made by Collins or his heirs to obtain a title under it.

4. That Joshua Kennedy held the lot under a grant from the Spanish government to Thomas Price, and a confirmation of the same by the United States, and a patent issued in 1837.

5. That the deed to Inerarity was "a special transaction, and not a recognition of title in Collins's heirs, given to enable Inerarity to recover a debt due from Collins's estate to John Forbes & Co., or as a compromise." That the deed to Samuel Kitchen was prior in date to that of Inerarity. That Kitchen was a *bonâ fide* purchaser without notice; that he paid for the land through Joshua Kennedy, who was indebted to him; and that in pursuance of his purchase Kitchen took possession of the lot and made improvements, and afterwards gave Joshua Kennedy a written obligation to convey to him; and that the "transaction was closed" in 1834, by his making a deed to William Kitchen at the request of Joshua Kennedy.

6. That the title of Collins, whatever it was, if any, was extinguished and transferred to William Kitchen by the deed of Inerarity made under a decree of the court, and in consideration of the payment of the debt claimed by Inerarity in behalf of Forbes & Co. against Collins's estate.

7. That the claim of complainant was extinguished by his own release and that of his brother to William Kitchen for a consideration paid by Joshua Kennedy.

8. And lastly, the answers, denying all fraud, insist that the full value of the property was paid by Kennedy to the administrator and heirs; and that the sale and releases so made have been acquiesced in by complainant for many years, without any offer to return the consideration or annul the deeds, until after the death of Joshua Kennedy.

The immense mass of evidence taken under the authority of the Circuit Court occupied a printed volume of nearly five hundred pages. The following is an abstract of the points which the complainant sought to establish. It is not necessary to refer to the evidence in support of each point.

1. That the plaintiff claimed the south half of the Baudain claim in Mobile as the devisee of his father, and the heir of two brothers, under a Spanish grant to his father and articles of agreement between his father and William E. Kennedy, and possession under them, and a deed confirmatory of them.

2. That the title of Alexander Baudain became perfect by the confirmation of the United States, under an act of Congress dated 8th May, 1822, relative to claims of lots in Mobile.

3. That a fraud was practised in the deed made by William E. Kennedy to Samuel Kitchen, and that Joshua Kennedy was a party to it.

4. The participation of Joshua Kennedy in the preparation of the deed to Samuel Kitchen, his beneficial interest in that deed, and his conception of the fraudulent design, are shown by the use that was made of it, by the relations between the parties, and by the fact that all the benefits flowing from it came to him.

5. That Joshua Kennedy brought forward the claim of Price, for the fraudulent purpose of superseding the Baudain claim, in which Collins had an interest, and thus obtaining the whole for himself.

6. That Kennedy, after having obtained a confirmation and location of the Price claim, purchased from the children of Collins all their rights, under circumstances which show the purchase to have been invalid.

7. That the deeds from the children of Collins were made to William Kitchen, and ought to be set aside.

8. That William Kitchen conveyed to Joshua Kennedy, who obtained a patent in 1837 for the Price claim, covering the land in which Collins had an interest.

9. That the children of Collins left the State of Alabama, and the fraud was not discovered until after the death of Joshua Kennedy (in 1838), and in the progress of a suit which ensued thereupon. The plea of limitations therefore does not apply.

10. That the purchase money paid to the children of Collins was greatly below the real value of the property.

On the other hand, the points which the defendants endeavored to establish by the evidence were the following.

1. That Joseph E. Collins was never married to Elizabeth Wilson.

2. That the agreement in 1806, between William E. Kennedy and Joseph E. Collins, was not a settlement of conflicting claims under the Baudain grant.

3. That Kennedy had a right to waive the conditional concession from Collins, and throw himself upon his own better title; and that, in fact, he did disavow all title derived from Collins.

4. That the deed made in 1820, from William E. Kennedy to Samuel Kitchen, was not fraudulently made for the benefit of Joshua Kennedy.

5. That the purchase made by Joshua Kennedy from the children of Collins was fair and *bonâ fide;* that their interest was only contingent, after paying their father's debts; that the property was a marsh liable to be overflowed, and at the distance of several squares from the business parts of the city, whose value was entirely speculative; and that Kennedy paid as much as their interest in it was worth.

6. That Joshua Kennedy never attempted to complicate the title or obscure the rights of other persons.

7. That the enhanced value of the property is owing entirely to Joshua Kennedy's industry and judgment in reclaiming and defending it at great expense; and that a court of equity should not deprive his heirs of this advantage without clear proof of fraud.

It has already been mentioned, that the evidence taken in the cause was very voluminous to sustain the above positions upon both sides, some of which indeed are rather inferences in law than distinct allegations of fact.

But the two classes are so intermingled together, that it appeared impossible to separate them and yet give a thorough explanation of the case.

On the 13th of April, 1847, the cause came on for argument in the Circuit Court, which rendered the following decree, viz.: —

" SIDNEY E. COLLINS *v.* THE HEIRS AND EXECUTORS OF JOSHUA KENNEDY.

" This cause this day came on to be heard, and it is ordered, adjudged, and decreed, that the deeds of Sidney E. Collins and his brother, George Collins, to William Kitchen, be set aside, and that the representatives of Joshua Kennedy account for the rents and profits received from the said south half of the said lot of land, and also the money derived from the sale of any portion thereof, together with interest thereon, and that the said representatives be allowed for all permanent improvements made on the said land; also the money paid to Sidney E. and George Collins, with interest; and that it be referred to the master to take an account between the parties, in conformity to the principles of this decree."

From this decree, the defendants appealed to this court.

It was argued by *Mr. Hopkins,* and *Mr. Reverdy Johnson,* for the appellants, and *Mr. J. A. Campbell,* for the appellee. Their arguments were so blended of matters of fact as deduced from the evidence and matters of law arising thereupon, that

it is impossible to make an accurate report of them without going too much into detail.

Mr. Justice GRIER delivered the opinion of the court.

It will not be necessary, in the consideration of this case, to notice particularly the great mass of documents and testimony spread upon the record, further than to state the results as they affect the several points raised by the pleadings and argued by the counsel.

1. The first of these in order is that which relates to the sufficiency of the probate of the will of Joseph Collins, under whom the complainant claims. But as his claim to two thirds of the property in dispute is through his deceased brothers, he is compelled to remove the objection which has been urged to his and their legitimacy; and if he can succeed in this, and thus establish his right by descent, the decision of the question as to his title by devise will be unnecessary. We shall therefore proceed to examine the second point, as to the legitimacy of the complainant.

2. It is not denied that the complainant and his deceased brothers Joseph and George were the children of Joseph Collins by Elizabeth Wilson, but it is contended that the parents were never legally married.

The evidence on this subject is as follows. Joseph Collins resided in the country south of the 31st degree of north latitude, between the Iberville and Perdido, and died there about the year 1811 or 1812, while that country was still in the actual possession of the Spanish government. In the year 1805 he resided in Pascagoula. Elizabeth Wilson resided also in the same place, and in the family of Dr. White, who was a syndic or chief public officer in that place. A contract of marriage was entered into by Joseph Collins and Elizabeth Wilson before Dr. White, who performed the marriage ceremony. The parties continued to live together as man and wife, and were so reputed, till the death of Collins. It is true that some persons did not consider their marriage as valid, because it was not celebrated in presence of a priest, while others entertained a contrary opinion. It is in proof also, that Collins himself, when he made his will, entertained doubts on the subject.

It is a matter of history, that many marriages were contracted in the presence of civil magistrates, and without the sanction of a priest, in the Spanish colonies which have since been ceded to the United States. Whether such marriages are to be treated as valid by courts of law is a question of some importance, as it may affect the titles and legitimacy of

many of the descendants of the early settlers. It is not the first time that it has arisen, as may be seen by the cases of Patton-*v.* Philadelphia, 1 Louisiana Annual Reports, 98, and Phillips *v.* Gregg, 10 Watts, 158.

The question, then, will be, whether an actual contract of marriage, made before a civil magistrate, and followed by cohabitation and acknowledgment, but without the presence of a priest, was valid, and the offspring thereof legitimate, according to the laws in force in the Spanish colonies previous to their cession.

That marriage might be validly contracted by mutual promises alone, or what were called *sponsalia de presenti*, without the presence or benediction of a priest, was an established principle of civil and canon law antecedent to the Council of Trent. (See Pothier du Contrat de Mariage, Part II. ch. 1; Zouch, Sanchez, &c.; and Dalrymple *v.* Dalrymple, 2 Haggard's Consistory Reports, 54, where all the learning on this subject is collected.)

Whether such a marriage was sufficient by the common law in England, previous to the marriage act, has been disputed of late years, in that country, though never doubted here. (See the case of The Queen *v.* Millis, 10 Clark & Fin. 534.)

On the Continent, clandestine marriages, although they subjected the parties to the censures of the Church, were not only held valid by the civil and canon law, but were pronounced by the Council of Trent to be "*vera matrimonia.*" But a different rule was established for the future by that council, in their decree of the 11th of November, 1563. This decree makes null and void every marriage not celebrated before the parish or other priest, or by license of the ordinary, and before two or three witnesses.

But it was not within the power of an ecclesiastical decree, *proprio vigore*, to affect the *status* or civil relations of persons. This could only be effected by the supreme civil power. The Church might punish by her censures those who disregarded her ordinances. But until the decree of the council was adopted and confirmed by the civil power, the offspring of a clandestine marriage, which was ecclesiastically void, would be held as canonically legitimate. In France the decree of the council was not promulgated, but a more stringent system of law was established by the Ordonnance de Blois, and others which followed it. In Spain it was received and promulgated by Philip the Second in his European dominions. But the laws applicable to the colonies consisted of a code issued by the Council of the Indies antecedent to the Council of Trent, and are to be found in the code or treatise called Las Siete Partidas

and the Laws of Toro. The law of marriage as contained in the Partidas is the same as that which we have stated to be the general law of Europe antecedent to the council; namely, "that consent alone, joined with the will to marry, constitutes marriage." We have no evidence, historical or traditional, that any portion of this code was ever authoritatively changed in any of the American colonies; nor has it been shown, that in the "Recopilacion de los Indies," digested for the government of the colonies by the order of Philip the Fourth, and published in 1661, nearly a century after the Council of Trent, any change was made in the doctrine of the Partidas on the subject of marriage, in order to accommodate it to that of the council. It may be supposed, that, as a matter of conscience and subjection to ecclesiastical superiors, a Catholic population would in general conform to the usages of the Church. But such conformity would be no evidence of the change of the law by the civil power. Indeed, the fact that the civil magistrates of Louisiana had always been accustomed to perform marriage ceremonies, where the parties were Protestants, or where no priest was within reach, is conclusive evidence that the law of the Partidas had never been changed, nor the decree of the Council of Trent promulgated, so as to have the effect of law on this subject in the colony. The case of Patton v. Philadelphia, already referred to, shows the opinion of the Supreme Court of Louisiana on this subject, which, on a question relating to the early history and institutions of that country, should be held conclusive.

3. These preliminary questions being thus disposed of, our next subject of inquiry must be, whether Joseph Collins had any right or title to the land in dispute which descended to and vested in his heirs.

On the 3d of January, 1803, Joseph Collins, who was captain of dragoons and surveyor of the district, made application to Don Joaquim de Osorno, military commandant of Mobile, and obtained a permit, in the usual form, to take possession of a certain lot of marshy ground therein described, near to or in the city of Mobile. The permit was dated on the 26th of April, 1803. This, though merely an inception of a title, was capable of being ripened into a legal title by possession and improvement, which would give him a right to call on the Intendant-General to perfect his grant by a complete title. In order to keep up his possession and improvement on this lot, Collins entered into agreement under seal, dated the 21st of November, 1806, with William E. Kennedy, by which Kennedy covenanted to improve the lot, "so that, by fencing and ditching, the said lot may not be forfeited, and that he will begin to improve

said lots immediately. By this agreement, Collins was to have the south half of the lot, and the north half was to be conveyed to Kennedy.

Whether Kennedy was at this time the owner of the Baudain claim to the same lot, and the compromise of their conflicting claims was in part the consideration of this contract, or whether the Baudain claim was first purchased by Kennedy in 1814, when its transfer bears date, is a question of no importance in the case. For it is clearly proved that Kennedy took and held possession of the lot, and made the improvements in pursuance and under his contract with Collins. And whether we consider him as agent, partner, or tenant of Collins, his purchase of another claim would enure to their joint benefit. He could not use the possession and improvement made for Collins to complete an imperfect and abandoned grant to Baudain, as was done, and by such act exclude Collins from his half of the lot. The deed which Kennedy afterwards gave to Inerarity shows clearly that he entertained no such dishonest intention. For after acknowledging by this deed his contract with Collins, and stating his intention to complete the title under the Baudain permit or grant, he proceeded to substantiate his title before the commissioners by proving the possession and improvements made by him under his contract with Collins as the meritorious foundation of his claim ; and thus obtained a favorable report from the commissioners under the Baudain grant, which had been before rejected for want of such proof.

. By the act of Congress of the 8th of May, 1822, § 2, all claims to lots in the town of Mobile, on which favorable reports had been made by the commissioners, " founded on orders of survey, requettes, permissions to settle, or other written evidence of claims, derived from either the French, British, or Spanish authorities, and bearing date before the 20th of December, 1803, and which ought in the opinion of the commissioners to be confirmed, were confirmed in the same manner as if the title had been completed."

By this act, the legal title to this lot became vested in William E. Kennedy. A patent would be but further evidence of a title which was conferred and vested by force of the act itself. Having thus obtained the legal title in his own name, Kennedy required no deed from Collins or his representatives, but became seized thereof for his own use as to the northern half, and for the use of Collins, or in trust for his heirs, as to the southern. Inerarity might have maintained an action of covenant on his deed, and compelled him to transfer the legal title by a further assurance. There might be some question, perhaps, whether the legal estate did not immediately vest in Ine-

rarity by estoppel. But as the conveyance is a deed poll, in the nature of a quitclaim and release, without a warranty, and with a covenant for further assurance to Inerarity, or the heirs of Collins, it most probably would not. But for the purposes of this case the question is wholly immaterial. Inerarity, as a creditor of the estate of Collins, would have a right to demand the payment of his debt, before he should make a transfer to the heirs. But whether as holder of the legal or equitable estate in trust, his beneficial interest amounted to no more.

Some objections have been urged to the view we have taken of this transaction, on the ground that the contract made in 1806 with Collins was not binding. But although we cannot perceive the right of persons, who have purchased the legal title from Kennedy, with full notice of the trust, to object to a contract which Kennedy has executed, we shall proceed to notice them. The first objection is, that Collins did not sign the indenture or articles of agreement of 21st November, 1806, and was therefore not bound to convey to Kennedy; and there was therefore no consideration which could make the deed binding on him. But the deed on its face purports to be an indenture, of which Collins, from the nature of the transaction, would be holder of the counterpart, signed by Kennedy. The original, which is signed by the grantor, would be in possession of Kennedy the grantee, who cannot object to the validity of his covenant, because a paper is not produced which, if in existence, is in his own possession. Much less could he be heard to make this allegation after the contract has been executed by his own deed sealed and delivered in pursuance of it.

It has been objected, also, that the original contract with Collins was void as against the policy of the law. But it was certainly not against the policy of the laws of Spain, under which it was made; for it was a fulfilment of the conditions of the grant made to Collins. And it cannot well be said to be contrary to the policy of the laws of the United States, who have confirmed the land to Kennedy in virtue of the very possession and improvements made in pursuance of the contract.

Thus far, then, we have in 1822 the legal title to the whole lot vested in W. E. Kennedy, in trust, as to the southern half, for the heirs of Collins.

4. What, then, was the effect of the deed made to Samuel Kitchen, dated, or antedated, some two months before the deed to Inerarity?

The circumstances which tend to show that this deed was made *after* that to Inerarity, and for the purpose, if possible, of defeating it, are very strong and convincing.

1st. Joshua Kennedy, who acted as the agent for Kitchen, or

used Kitchen's name for his own purposes, was a witness to the deed to Inerarity, and made no objections nor suggestions that he had bought and paid for this lot a few days before as agent of Kitchen, — a circumstance not easily accounted for, if such had been the fact. 2d. The deed to Kitchen was acknowledged *after* that to Inerarity, at the same time with another deed from W. E. Kennedy to Joshua Kennedy, containing property previously sold to Inerarity, and having the same witness, Diego McBoy. " And 3dly. The frequent declarations of Joshua Kennedy that the object of the deed made to Kitchen, through his intervention, was to defeat Inerarity's claim to that property." And lastly, the fact that Samuel Kitchen gave Joshua Kennedy an obligation to convey the lot to him on request; which was afterwards fulfilled by giving his deed to William Kitchen for a nominal consideration; and that William's name was used by Kennedy for the purpose of covering and complicating the transaction.

But it is a question of no importance in the case, whether the deed to Samuel Kitchen was delivered on the day it bears date, or that on which it was acknowledged. He was not the purchaser of a legal title without notice of a secret equity. The rule with regard to purchasers of a mere equity is, *Prior in tempore potior in jure.*

The equitable title of Collins, of which the deed to Inerarity contained a new acknowledgment, had its origin at least as far back as 1806. So that, even if we could bring ourselves to believe that Joshua Kennedy, whether acting for Kitchen or himself, had purchased and paid his money without notice of the title of Collins's heirs, it would not enable him to defeat their claim. The legal title first became vested in W. E. Kennedy in 1822, and passed by his deed of 1824 to Joshua Kennedy, with full knowledge of the trust. His attempt to defeat it, by covering the land with the vagrant and probably fraudulent claim under Price, after he had obtained the legal title from the United States, was as unsuccessful as the first, and wholly inoperative, except to show the shifts and contrivances resorted to, in order " to defeat Inerarity's claim."

5. We come now to the consideration of the validity of the deeds of release obtained from George and Sidney E. Collins, in 1829 and 1830.

At this time the property had risen in value, with a prospect of a much greater increase; and the frailty of the title was but too transparent to a man of the judgment and shrewdness of Joshua Kennedy, notwithstanding the means used to obscure it. The heirs had just come of age. They were ignorant of the nature or value of their title. Kennedy is not only

16 *

in possession of their land, but of the legal title. He persuades them to release their title to William Kitchen for the sum of one thousand dollars each; a sum which, to young men just out of their apprenticeship, poor, and ignorant of their rights, would appear large and attractive. Kennedy is well acquainted with the nature and value of their claim; they are wholly ignorant of it. He informs them that their claim is worthless, but that Kitchen was willing to give them this sum for the sake of peace and quieting his title. Besides, he had so complicated and covered up the title, that it was impossible that they could comprehend it, or know the value of their claim, if the documents had been laid before them. Under such circumstances should a chancellor hesitate in setting aside the releases, if it appeared that the title thus obtained was for a consideration much below the value of the property? It needs no citation of authorities to show that deeds obtained under such circumstances would be held void.

6. The transfer by Inerarity of the equitable trust title held by him, can add nothing to the validity of Kennedy's title. Whether transferred by him voluntarily, or through the medium of a decree in chancery, can make no difference in this case. Nor is Inerarity liable to any imputations of collusion or improper conduct in the matter. He was bound to transfer his title to the heirs on payment of his debt. And when their releases to Kitchen were produced, by which he appeared to be substituted to their rights, Inerarity, who was ignorant of the means used to obtain them, might justly believe that he was bound to convey to him. He did so, after consulting counsel, and after a decree in equity. Such a decree would be made as a matter of course. But its effect would only be to substitute Kitchen or Kennedy to the rights of Inerarity. The title would be still subject to the trust for Collins's heirs, and unless their title was vested in Kennedy by these releases, he held the land still subject to their rights. But when the releases to the heirs are set aside, Kennedy is entitled to recover the money paid to Inerarity, as there is no allegation that the debt claimed by Forbes & Co. against Collins's estate was not justly due.

But before leaving this part of the case, it will be proper to notice an objection urged with some plausibility in the argument. The record exhibits much contradictory testimony as to the value of this property at the time the releases were executed, and it has been contended that Kennedy paid the full value for it, being altogether over $4,000. After such a length of time, it may be expected that the estimates of witnesses from recollection will differ widely. But when we look at the public assessments, and the sales of contiguous property about the

same time, which are the best tests, it would seem that the boast of Joshua Kennedy himself, that "he had bought for $4,000 property worth $40,000," was not an exaggeration of the truth. But assuming the true value to have been one half that sum, and taking into consideration the facts and circumstances already stated, we think the Circuit Court was fully justified in setting aside these conveyances, and decreeing that the defendants should account.

7. The absence of the complainant from the State, and the late discovery of the fraud, fully account for the delay and apparent laches in prosecuting his claim, which have been objected to, on the argument.

The decree of the court below is therefore affirmed, but with this addition: "that the master, in taking the account of rents, profits, sales, &c., shall allow to the defendants the sum paid to James Inerarity for his claim against the estate of Joseph Collins."

## Order.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the Southern District of Alabama, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged and decreed by this court, that the decree of the said Circuit Court in this cause be, and the same is hereby, affirmed, with costs, and with this addition: " that the master, in taking the account of rents, profits, sales, &c., shall allow to the defendants the sum paid to James Inerarity for his claim against the estate of Joseph Collins "; and that this cause be, and the same is hereby, remanded to the said Circuit Court, to be proceeded with in conformity to the opinion of this court.