Spalding. J.
The questions presented in this case derive their chief importance from the supposed magnitude of the property in controversy. They are not new, and, of course, not difficult of solution, if we give to them the same effect, whether applied to estates of two thousand or two hundred thousand dollars value.
I shall first examine the objection started to the deed under which Carneal held the land in controversy. It is said that this deed, did not transfer the legal title in the premises from Irwin to" *511 ■Carneal, because, in the granting clause, it purports to be a conveyance from William Irwin to “William Irwin,” and not to Thomas D. Carneal. The objection is not tenable. If we recur to the deed itself, it sufficiently appears, even in the premises, that Irwin had no intention of retaining the fee in himself. It purports to be an indenture made between “ William Irwin, of the first part,” and “ Thomas D. Carneal, of the second part.” It acknowledges a consideration of five thousand'dollars as paid by Thomas D. Carneal to the said William Irwin, from which consideration springs the grant made, nominally, to William, Irwin, but completely repudiating him as the “holder of the legal title,” in language that can not be misunderstood, and which follows the description of the lands thus: “ And all the estate, right, title, interest, claim and demand of him, the said William Irwin, of, in, and to the said premises and every part thereof.”
The parties to a deed must be truly and sufficiently described, but conveyances are good when made to a grantee by a certain-designation, without the mention of either the Christian or surname, *for “ id est cerium, quod potest reddi cerium.” 4 Kent’s Com. 462.
“ Astriet, literal, and grammatical construction of an instrument, in its various parts, taken separately, would sometimes be absurd, sometimes contradictory, and frequently unjust; because against the manifest intention of the parties. But a liberal consideration is to be had of the whole instrument, in relation to the subject matter, to discover what was the true intention of the parties.” Sumner’s Adm’r, etc. v. Williams, 8 Mass. 174.
Certainly, if we adopt these rules of construction the objection disappears, for no intelligent mind can read this whole instrument and be at a loss for the true intent and meaning of the parties. But in a more critical view of the subject, the deed we are considering is effectual to pass the fee.
William Irwin could not convey to himself. The insertion of his name as the grantee is a nullity. The deed then stands as if no grantee was named in, the “premises,” and where that is the case, one named in the “habendum” may take. 2 Hilliard on Real Prop. 355, sec. 149.
“ If one give or grant land, habendum, to B., and his heirs, and he is not named in the premises, yet this is a good deed to make an estate in fee simple.” Sheppard’s Touchstone, chap. 5, p. 75,
*512 Here, then, we have a deed, absolute on its face, conveying the land in controversy to Thomas D. Carneal. It is admitted that Carneal did not pay, and that he was never expected to pay one dollar of the consideration money, named in the deed to William Irwin, for the land.
He says, in his deposition, that William Irwin called upon him in the year 1821, and said to him: “With your consent, I shall make to you a deed for some lots in Cincinnati, and for my interest in a tract of land near this city, held jointly by Wm. H. Harrison and myself. Mr. Nicholas Longworth will prepare the deed and hand it to you, executed by me, and take *from you such a paper as will make the conveyance bona fide and stand good in law.”
For what purpose was the deed made? In August, 1838, Nicholas Longworth made a voluntary affidavit, in respect to the particulars of this transaction, and the same is now produced as evidence in the cause.
In this affidavit Longworth says he is “ as positive as he can be of any fact, after the lapse of so many years, that the sole reason given by William Irwin to him for the conveyance, was to prevent, certain claims against Irwin & Son from becoming a lien on said real estate, and for no other reason.”
This is somewhat variant from the reason assigned in his principal answer, which was, that Irwin feared the sacrifice of this property by means of a judgment about to be obtained against him by the government, as the surety of Smith. • It is a matter of no moment, however, so far as the decision in this case is concerned.
Either version, in connection with what Longworth further says in the same affidavit, will seem to satisfy a mind of less than ordinary quickness of apprehension, that Irwin wished to “ hinder and delay creditors; and that Longworth at first consented to make Carneal a trustee of the property, ostensibly for his benefit as an indorser at the bank, but in reality, to hold the same for the use of Irwin.
The explanation of Longworth, as given in his affidavit, is this :
“ I then told him that, to stand the test, the conveyance must be bottomed on a real bona fide transaction. ‘If I have anything to do with it, it must be so that if called upon we can answer under oath. I am your indorser to the Bank of the United States, who *513 Lave your mortgage ; 1 do not ask or claim other security. If you wish, I am willing the property shall be deeded to Carneal to save me harmless from any eventual loss as your indorser to the bank. This can not be ascertained for years, and I will hold the property safe; but remember, *we may both bo called to answer under oath ; if so conveyed we must distinctly understand that it is to be held bona fide for that purpose, and that you hereafter wholly rely on my pleasure whether to let you use or dispose of any of the property or not.’ To this he readily assented.”
We do not entertain a doubt that up to the moment of the execution of the “second declaration of trust,” upon an exhibition of the testimony adduced in this case, a court of chancery would have given to the general creditors of .William Irwin the benefit of the property embraced in his deed to Carneal. We lay entirely out of view, then, the first “declaration” signed by Thomas D. Carneal, as well because it was part and parcel of a scheme to delay general creditors, not warranted by the law, as because it never received, in many of its important details, the sanction of William Irwin, and was finally abandoned by the parties in interest.
Nicholas Longworth may not impeach this deed of August 13, 1821, for fraud. As a quasi creditor of the grantor, he chose, by joining in the second declaration of trust, to regard it as valid collateral security for the bank debt, and will be bound thereby. G. & W. Renick v. Bank of Chillicothe, 8 Ohio, 533.
We now “take our departure” with a deed of the premises from Irwin to Carneal, and a written “ declaration of trust,” signed by Irwin and Longworth and lodged with Carneal, specifying that the estate transferred by said deed to Carneal “ shall continue as collateral security for Nicholas Longworth’s indemnity as indorser of William Irwin, in the Bank of the United States.”
This is “plain sailing.” The immediate and direct securities given to the bank by Irwin, and supposed to be ample, were to be first exhausted. In the event of a deficit, however, the land and town lots held by Carneal as a naked trustee were to be made available for its payment.
At this period it must have been considered by all the parties in interest, that there was a large resulting trust in William '¡"-Irwin. He could, at any moment, call for a reconveyance *514 of all the lands held by Carneal, by paying his bank debt, or by procuring the release of Longworth in some other way. If matters were pushed to extremities, it was believed that the property directly pledged to the bank would sell for enough, or nearly enough, to liquidate the whole claim, and leave intact the greater part of the trust property.
In 1824 William Irwin died, and from that period onward the equitable interest of Irwin and his heirs se'ems to have become obscure. The fee of the land was in Carneal, and from 1829 the possession and apparent ownership existed in Longworth. It is true that Archibald Irwin occasionally gave demonstration that Longworth was a usurper of his exclusive right. But for long years, and whilst these complainants were passing from childhood to manhood, no voice was heard to whisper that the personal representatives or heirs at law of William Irwin had any available interest in this great property. Longworth was in possession and claimed the whole. Archibald Irwin, although out of possession, claimed the whole, or at least the claims of each were predicated upon an alleged expenditure of money for William Irwin to so great an amount as to place the property entirely beyond the hopes of the administrators on the estate, saying nothing of the heirs and devisees.
In this condition of things, some time in the year 1838, or in the beginning of 1839, Archibald Irwin, through his friend N. G. Pendleton, proposed to Nicholas Longworth a division of the trust property. The proposition was accepted, and Carneal, the trustee, agreed to convey the lands in conformity with their arrangement, if the heirs of William Irwin would sign an. order for his safety. Col. Pendleton, the common friend of Nicholas Longworth and Archibald Irwin, applied to the latter to ascertain if his brothers, the present complainants, would probably sign the order. Archibald replied that “they would sign anything that he would, but that they had no interest.” The order was obtained and the deeds were made, by which ^Thomas D. Carneal conveyed to Nicholas Longworth all the interest in the “hill tract” which he had acquired by virtue of the deed from William Irwin; and to Archibald Irwin all the interest in the city lots which he had acquired from the same source.
Before the execution of this quitclaim deed by Carneal to Long-worth, no one had the boldness to deny the existence of an out *515 standing equity of redemption in the heirs of William Irwin. Whether the property was worth the serious exertion of the right when made subject to the somewhat magnified claims of both Nicholas Longworth and Archibald Irwin, is another and different question. Longworth himself admitted, in the most explicit terms5 in his letter to C. K. Smith, that the heirs of Irwin had “an equity of redemption ” in this property.
How has the conveyance from Carneal affected this right ? So far as it concerns the interest of the children of Louisa Whiteman, deceased, the condition of things is not changed at all, except that Thomas D. Carneal has devolved his trust upon Nicholas Long-worth, who will be made answerable to these children in his stead. If, however, by any unforeseen reverses of fortune, Longworth should no longer possess the ability to respond to this class of cestui que trusts, we do not see how Carneal can escape liability for a palpable breach of the trust. As it respects the complainants, wo find nothing in their written order of January 11, 1839, which purports to convey to Longworth their equity in the property. •Upon its face, the instrument -is nothing more than a safeguard to Carneal in executing deeds to Longworth and Archibald Irwin. He procured the order to be made, not to pass an equity from the heirs of Irwin to anybody, but for Ms own safety in conveying the fee of the land to Longworth and Archibald Irwin. He is author-' ized by the order, so far as the complainants are concerned, to make the deeds. If we travel outside of the order, and attempt to establish, by evidence aliunde, that the object had in view by the parties was to place the whole title to the “hill tract,” legal *and equitable, in Nicholas Longworth, we shall ascertain, by the same species of evidence, what is equally fatal to his claim, to wit, that William -Irwin and James F. Irwin, the complainants, were not acting in this business of directing conveyances with that knowledge and understanding of their just rights which they should possess before they can be bound thereby. 3 Serg. & Rawle, 331; 1 Story’s Eq., sec. 122.
Not only was there an error in reciting, in the paper itself, the uses to which the estate had been subjected in the hands of the trustee; but, if we may believe the testimony, these complainants were taught to believe, by their elder brother, that they had no interest in the trust property. Under such circumstances, wo should feel bound to interfere and set aside the instrument, if it *516 did, indeed, contain an express relinquishment of their equity of redemption.
In Evans v. Lewellyn, 2 Brown’s Ch. 151, a conveyance was set aside as improvidently entered into, where the plaintiffs were uninformed of their rights, though there was no actual fraud or imposition. The authorities are numerous to this effect, and I shall only cite, in addition, the strongly marked case of Hallett et al. v. Collins, recently decided in the Supreme Court of the United States, and reported in 10 How. 174: “ The assignee obtained releases, for an inadequate consideration, from the heirs of Collins, who had just come of age, were poor, and ignorant of their rights. These releases were hold void.”
We are entirely satisfied that the defendant, Nicholas Longworth, holds the premises commonly called the “hill tract,” consisting of one hundred acres, more or less, of land, near the city of Cincinnati, as the same were conveyed to him by Thomas D. Carneal, in the character of a mortgagee, for the security of any unpaid balance of the debt due to the late United States Branch Bank, at Cincinnati, by William Irwin, deceased, upon which the said Long-worth was surety for said Irwin.
The complainants, as heirs at law of said William Irwin, ^deceased, have a right to redeem the premises upon payment of the mortgage debt and interest. •
A decree will be rendered accordingly.
Hitchcock, C. J., dissented. See his dissenting opinion in Appendix B.