34 P.(2d) 672

## In re GABALDON'S ESTATE.

## GABALDON v. GABALDON.

### No. 3866.

Supreme Court of New Mexico.

June 25, 1934.

T. J. Mabry and J. G. Whitehouse, both of Albuquerque, for appellant.

Fred Nicholas, of Los Lunas, and A. T. Hannett, of Albuquerque, for appellee.

HUDSPETH, Justice.

This case presents the single question whether a marriage is of any validity in this state if effected only by present mutual consent of the parties, followed by cohabitation. Such relation is usually referred to as a common-law marriage. The question is not an easy one, and the court finds itself divided. All that can well be urged on the affirmative is embodied in the accompanying dissenting opinions.

If the common-law marriage, as such, has ever obtained legal standing here, it was on

the occasion and by virtue of the sweeping statute of 1876: "In all the courts in this state the common law as recognized in the United States of America, shall be the rule of practice and decision." (Comp. St. 1929, § 34-101.)

Of this, later.

■ By great weight of American authority such a marriage is an institution of the common law which crossed the Atlantic with the colonists and became implanted here. By great weight of authority also, the ordinary state regulatory statutes, unless expressly so providing, have not made the common-law marriage void. This is held as a matter of statutory construction. The theory is that such statutes do not create a new right, merely regulate a prior existing right, and that violation of the regulations is attended by such consequences only as the statute prescribes. Thus far we readily agree with the minority.

Without questioning the soundness or wisdom of the decisions constituting this weight of authority, we reach a different conclusion because of the unique legal and social history of this state.

New Mexico was not an uninhabited territory or one occupied only by savages, colonized by an English speaking people, bringing their common law with them. The Americans invaded a foreign territory and conquered a civilized people. The American military commander, proclaiming a code of laws for the conquered territory and people, long before the peace, did not establish the common law. He declared that: "All laws heretofore in force in this territory, which are not repugnant to, or inconsistent with the constitution of the United States and the laws thereof, or the statute laws in force for the time being, shall be the rule of action and decision in this territory." Kearney Code, "Laws," § 1; C. L. 1897, p. 82, Revised Statutes and Laws 1865, p. 512.

As to matters of procedure, this was varied somewhat when the Organic Act (section 10) conferred on the courts "chancery as well as common-law jurisdiction." Browning v. Estate of Browning, 3 N. M. 659, 9 P. 677. As to matters of substantive law, it gave way only to the general adoption of the common law, thirty years later.

In the meantime we were subject to that development of the civil law subsisting in the Spanish colonies, afterward in the Republic of Mexico, as modified by the Constitution and laws of the United States and by territorial statutes. Beals v. Ares, 25 N. M. 459, 185 P. 780.

■ Affecting the subject of marriage, there intervened, in 1860, an act of the legislative assembly which we deem of controlling force. It provided: "It shall be lawful, valid and binding, to all intents and purposes, for those who may so desire, to solemnize the contract of matrimony by means of any ordained clergyman whatsoever, without regard to the sect to which he may belong, or by means of any civil magistrate." Comp. St. 1929 § 87-102.

The first thing to be noted about this statute is that it is not regulatory in its language or apparent intent. It requires nothing of the

parties not before required. It seems to grant rights not understood to exist before. It cannot be read, in the light of historial facts, without gaining the impression that, in the belief of those who framed and passed it, the only valid marriage theretofore was one celebrated by a Roman Catholic priest.

Such may or may not have been the state of existing law. On that question, at this late time, we shall not assume to speak with assurance. But, in construing the statute, the manifest belief of the Legislature is nearly if not quite as important as the fact itself. The fact itself depends upon whether the Council of Trent (1563) had been proclaimed by the Spanish sovereign as effective in Mexico; a matter concerning which not all agree.

If we were to yield to the opinion of the Supreme Court of the United States (Hallett v. Collins, 10 How. 174, 13 L. Ed. 376) as to the historical fact, and say that the Council of Trent had efficacy in the American Colonies as ecclesiastical law only, it would not greatly alter the case. These early legislators may have been mistaken on a fine point of law, living as they did, remote from the centers of learning. But they must have thought that some law, if not the Council of Trent duly proclaimed, made a mere consent marriage invalid. If they understood the law to be, as now contended, that no solemnization was then necessary, it was pure supererogation to give validity to the act of an ordained clergyman or a civil magistrate.

According to the familiar cañon, to authorize an ordained clergyman or a civil magistrate to give validity to a marriage contract by solemnizing it, is to deny validity to marriages celebrated by others. If a marriage solemnized by an unordained clergyman would be invalid, a fortiori one not solemnized at all would be invalid.

The practical effect is as if the Council of Trent was the law of the land, and the territorial Assembly then modified it. So it seems to us, and so we think the law stood when the first regulatory statute was passed in 1863 (Laws 1862–63, p. 64), requiring registration and prescribing penalties. This later statute and those succeeding it have not the background of the common-law right. The pre-existing right involved the sanction of clergyman or magistrate.

We may well admit that the punishable failure of the clergyman or magistrate to record his act, under the 1863 statute, would not invalidate the marriage. When we have thus admitted, we think that we have given full force to the rule of statutory construction according to which the common-law marriage has survived statutory regulation.

█ In this view of the case, there can be no merit in a contention that the broad enactment of 1876 introduced the common-law marriage into New Mexico. The matter was already covered by local statutes. Cf. Beal v. Ares, supra.

It is strongly urged that Hallett v. Collins, supra, is to the contrary of our conclusion and controlling.

That decision held nothing directly as to New Mexico, and nothing directly as to common-law marriage. It held that the clandestine marriage, known to the civil law be-

fore the Council of Trent, was valid in the Spanish colony of Louisiana. In that conclusion it gave great weight to the decision of the Supreme Court of Louisiana (1846) in Patton v. Philadelphia, 1 La. Ann. 98.

The Patton Case is not persuasive here. Its theory is: First, that the kings of Spain did intend "that their adoption of general councils should extend to all countries which they might subsequently discover or acquire." Second, that the Council itself, as interpreted by the Popes, contemplated that its rigors might be relaxed by the temporal sovereigns "when they deemed it necessary to the public good * * * without the Popes or Bishops ever having considered the exercise of that discretion as an encroachment upon the rights and privileges of the Church." Third, that the king had abated the strict requirement of the Council "in the remote settlements of new colonies, yet unprovided with either churches or priests." This, on proof satisfactory to that court. Fourth, that the commandant who celebrated the marriage in question had declared that "he was authorized by the government to do so," which required application of the rule, for which it cites U. S. v. De la Maza Arredondo, 6 Pet. 714, 8 L. Ed. 547, that no one but his superiors could question the authority.

How does that theory affect our case? True, the Supreme Court of Louisiana doubted, though it conceded arguendo, that the real cedula of Phillip II, of 1564, put the Council of Trent in force in Louisiana. The doubt was not based upon any deficiency of the language of the royal decree to give it effect in the colonies. It was based on the fact that Louisiana had not been discovered at that date. But Mexico had then been subjected, and New Mexico explored and claimed.

Conceding that the Spanish king might have moderated the rigor of the Council of Trent for Mexico without offense to the church, we have not the evidence of his having done so that the Louisiana Supreme Court accepted. Nor did that evidence indicate, or either the Louisiana Supreme Court or the Supreme Court of the United States hold, that the Council was moderated to the extent of dispensing with solemnization or celebration. The relaxation consisted merely in providing other official celebrants in the persons of civil magistrates. That is just what the territorial Assembly did in 1860, extending the authority also to the non-Catholic clergy. It acted by the same right by which the Spanish sovereign is assumed to have acted in Louisiana. The fact that it did so act is evidence of the necessity for it; that is, that the Spanish or the Mexican government had not previously so acted.

We might admit the doctrine of U. S. v. De la Maza Arredondo, supra, with no effect upon the question before us.

The clandestine marriage sustained by the Louisiana Supreme Court, and by the Supreme Court of the United States, is not the common-law marriage at all. It was valid even if one of the parties was incumbered at the time with a living spouse, so long as the other party acted in good faith and was deceived. Patton v. Philadelphia, supra. If such was ever the law in New Mexico, it can-

not have survived the adoption of the common law in 1876.

Of course the Hallett decision was binding upon us as a territory. If it had established the validity of a common-law marriage, we should not think of holding otherwise now. Indeed all would have accepted it, and the present case would not be before us.

But all that there is in that decision to give us concern is the evident opinion of the court that the Council of Trent had nothing but ecclesiastical authority behind it in the Spanish colonies in America. The reason given by Mr. Justice Grier for so concluding is not entirely convincing, and the question is one pertaining more to historical than to legal science.

Even if that conclusion is correct, it does not greatly matter. All that it suggests is the argument, by analogy, that if the common-law marriage could survive regulatory statutes not expressly invalidating them, the clandestine marriage could survive such regulations. The analogy fails when we consider that before the course of statutory regulation began, the clandestine marriage had been abolished. The act of 1860, according to one view, abolished it; according to another, is sufficient evidence of its earlier abolishment.

If the Supreme Court of the United States was right, and the territorial Assembly wrong, as to the historical fact, we still think that the former would have sustained the territorial Supreme Court in interpreting the act of the latter (1860) as we interpret it here; not only because the interpretation is correct, but in conformity with the general rule as to the great weight to be given to a decision by the highest court of a territory as to its history and customs and as to construction of local laws. Halsey v. Ho Ah Keau (C. C. A.) 295 F. 636; Notley v. McMillan (C. C. A.) 16 F.(2d) 273; Territory of Hawaii v. Gay (C. C. A.) 52 F.(2d) 356; Yoshizawa v. Hewitt (C. C. A.) 52 F.(2d) 411, 79 A. L. R. 317.

It is urged, as an unfortunate consequence of what we hold, that children of innocent parents may be bastardized. But, recalling the ease with which a mere adulterous relation may become, in the mouths of interested and unscrupulous witnesses, a common-law marriage, an opposite conclusion promises the same or worse results of illegitimacy and upsetting of titles.

We think that irregular marriage is now, and has been in the past, as little practiced in New Mexico as elsewhere. In 1860 the non-Catholic population was inconsiderable. The edicts of the church were deemed highly binding upon conscience. Marriage was generally regarded as a sacrament. The Act of 1860 reflects the view that the law of the church in that regard was the law of the state. No doubt, with the influx of men from the east, irregular alliances were formed with native women, some of them perhaps marriages according to the common law. This situation was rather effectively cleared up by the Edmonds-Tucker Act (USCA title 18, § 519), in force here from 1887 until statehood. While it did not itself effect the invalidity of any marriage or attempted marriage, it was in fact rigorously enforced, resulting in

the postponed celebration of many, and in discouraging future alliances except according to the forms of law.

We consider that the alliance here involved did not constitute a valid marriage. The court below so held. The judgment should be affirmed, and the cause remanded, and it is so ordered.

WATSON, C. J., and ZINN, JJ., concur.

BICKLEY, Justice (dissenting).

The first statute of the territory pertaining to marriage which we have discovered was approved February 2, 1860 (§ 87-102, Comp. St. 1929). It is as follows: "It shall be lawful, valid and binding, to all intents and purposes, *for those who may so desire*, to solemnize the contract of matrimony by means of any ordained clergyman whatsoever, without regard to the sect to which he may belong, or by means of any civil magistrate." (Italics supplied.)

Among most nations and in all ages has the celebration of marriage been attended with forms and ceremonies which have partaken more or less of a religious character. Schouler says that although in the time of Cromwell justices of the peace were permitted to perform the ceremony, popular usage by no means sanctioned it. See "Marriage, Divorce, Separation and Domestic Relations" (6th Ed.) page 1445. The author also says in the same connection that Lord Hardwicke's Act, wherein formal religious celebration was prescribed, was of too recent a date to be considered as a part of our common law. The foregoing territorial act made it clear that the right to perform a religious celebration was not limited to ordained ministers of any particular religious sect, and was permissible also by civil magistrates. It is permissive and not mandatory nor prohibitory in form.

At the legislative session of 1862–63, (page 64) an act "regulating marriages" was adopted. Much of this act has been preserved, and with some amendments appears in chapter 87, Compiled Statutes 1929. It provided for record of marriages and imposed penalties on persons charged with making records of marriages for failure to make and preserve such records. There was nothing in these early acts which declared marriages performed without celebration by authorized officiants invalid.

The first act of the legislature which declared any marriages void or invalid was enacted at the 1875–76 session (chapter 31). By that act marriages between certain relatives were prohibited and declared void, and marriages between persons under certain ages were declared to be invalid. These provisions will be found with some modifications in our present marriage statutes.

At the 1905 session, the Legislature passed "An Act regarding marriages, providing for uniform system of records thereof and for other purposes." (Laws 1905, c. 65) The first section provided that all persons desiring to enter into a marriage relation in the territory of New Mexico shall obtain a license from the probate clerk in the county where they desire the marriage to occur. The second section required the clerk to issue license upon

proof of legal qualifications. Section 3 required all persons authorized to solemnize marriage to require production of license. Section 4 required the marriage certificate to be sent to the probate clerk and prescribed the duties of the clerk with reference to recording the certificate. Section 5 declared that records of civil magistrates and religious societies were not interfered with by the act. Sections 7 and 8 provided certain forms of application for marriage license and for marriage license and marriage certificate. Section 9 made it a misdemeanor for the probate clerk or person authorized by law to perform the marriage ceremony to neglect or fail to comply with the provisions of the act.

An act of Congress applicable to the territory provided for the certification of marriage ceremonies; such certificate to contain certain data. Such certificates or the record thereof or a duly certified copy of the record was made prima facie evidence of the facts required by the statute to be stated therein in any proceeding, civil or criminal, in which the matter should be drawn in question. It was provided that the violation of any provision of the statute was punishable by fine or imprisonment. See USCA title 18, § 519.

Neither in the 1905 territorial act nor the act of Congress is unlicensed or unregistered marriage declared to be invalid.

In "Marriage and the State," a treatise by Richmond and Hall, published in 1929, it is said: "Universal adoption of the licensing," "system by our states came slowly. As late as 1887, eleven states had not yet adopted licensing and publication of the banns is still

a legal substitute for the marriage license in three states. Save for this minor exception, however, all states now require a license, though it is well to remember that legal regulation of some sort long ante-dated our present marriage license system. No one now is authorized by the state to enter into matrimony and no one (with an alternative provided in only three states) can perform the marriage ceremony legally unless a state license has been granted to the two candidates. But unlicensed marriages, though forbidden, *are not invalid for that reason unless the state law specifically declares them to be so;* and a marriage act proposed by the commissioners on Uniform State Laws," "but adopted as yet in two states only, would make the license an essential of every valid marriage. *The strength of any license system, however, rests not so much upon the provision that requires candidates to obtain licenses as upon the one that penalizes those who officiate at marriages without requiring candidates to present licenses in satisfactory form.*"

It will not be my purpose to enter into an exhaustive review of the decisions upholding common-law marriages in the various states and territories of the United States.

The student will find it interesting to consult the Annotation in 39 A. L. R. at page 538, (1925), considering "Validity of common-law marriage in American jurisdictions." The annotator lists thirty jurisdictions which sustain the view that common-law marriage is valid. He lists eighteen jurisdictions in which such marriages are held to be invalid. In a number of these eighteen jurisdictions

common-law marriages were formerly recognized as valid, but later such marriages were abrogated by statute. Among these the note writer in L. R. A. 1915E, 19 lists California, Illinois, Kentucky, possibly Louisiana, North Dakota, Oregon, Tennessee, Virginia, Washington, and West Virginia.

See, also, Woodward Iron Co. v. Dean, 217 Ala. 530, 117 So. 52, 60 A. L. R. 541; Furth v. Furth, 97 Ark. 272, 133 S. W. 1037, Ann. Cas. 1912D, 597; Love v. Love, 42 Okl. 478, 142 P. 305, L. R. A. 1915E, 109; 17 E. R. C. 172.

The case at bar is the first case in which the question has been squarely presented in this court.

The answer to the question lies properly in a consideration of the legislative enactments aided by such expression of opinion as is available, rules of statutory construction, in view of the nature of the marriage relation as described by the courts and law-writers.

A statement of the annotator first above referred to is characteristic of the others, as follows: "At common law no formal ceremony was essential to a valid marriage, and an agreement between the parties per verba de præsenti to be husband and wife, consummated by cohabitation as husband and wife, constituted a valid marriage. The validity of such a marriage was recognized at an early date in the United States, and it is now generally held that the statutory provisions as to the formal solemnizing of marriages and the preliminaries thereto, and subjecting a person who performs the ceremony without the specified preliminaries to criminal punishment,

are directory merely, and do not affect the validity of common-law marriages."

The question is thus stated in 18 R. C. L. Marriages, § 18: "The question most frequently arising in reference to statutes regulating marriage is whether the method of creating the marriage relation provided is exclusive. No doubt a statute may take away a common law right; but there is always a presumption that the legislature has no such intention, unless it is plainly expressed, and marriage acts, while they regulate the mode of entering into the contract, do not confer the right. Hence they are not within the principle that, where a statute creates a right and provides a remedy for its enforcement, the remedy is exclusive. While a statute may declare that no marriages shall be valid, unless they are solemnized in a prescribed manner, such an enactment is a very different thing from the usual statute which requires all marriages to be entered into in the presence of a magistrate or a clergyman, or that it be preceded by a license, or publication of banns, or be attested by witnesses. Such formal provisions may be construed as merely directory, instead of being treated as destructive of the common law right to form the marriage relation by words of present assent, and this is the rule generally adopted in construing statutes regulating marriage. Whatever directions they may give respecting its formation or solemnization, the courts have usually held a marriage good at common law to be good notwithstanding the statutes, unless they contain express words of nullity. This construction is not precluded by the fact that the statute in question imposes a penalty, or even

though the parties themselves may be punished criminally. These statutes are held to be directory, because marriage is a thing of common right, because it is the policy of the state to encourage it, and because, as has sometimes been said, any other construction would compel holding illegitimate the offspring of many parents conscious of no violation of law. It has been said also that the legislatures must have been conscious of the common law, and that if they had desired to invalidate marriages in pursuance of it, they would have so declared in unmistakable terms."

We accept as strongly persuasive the reasoning of our highest court in Meister v. Moore (1877) 96 U. S. 76, 78, 24 L. Ed. 826, where the court had under consideration a Michigan marriage where the statutes were similar to ours. The court said: "Marriage is everywhere regarded as a civil contract. Statutes in many of the states, it is true, regulate the mode of entering into the contract, but they do not confer the right. Hence they are not within the principle, that, where a statute creates a right and provides a remedy for its enforcement, the remedy is exclusive. No doubt, a statute may take away a common-law right; but there is always a presumption that the legislature has no such intention, unless it be plainly expressed. A statute may declare that no marriages shall be valid unless they are solemnized in a prescribed manner; but such an enactment is a very different thing from a law requiring all marriages to be entered into in the presence of a magistrate or a clergyman, or that it be preceded by a license, or publication of banns, or be attested by witnesses. Such formal provisions may be construed as merely directory, instead of being treated as destructive of a common-law right to form the marriage relation by words of present assent. And such, we think, has been the rule generally adopted in construing statutes regulating marriage. Whatever directions they may give respecting its formation or solemnization, courts have usually held a marriage good at common law to be good notwithstanding the statutes, unless they contain express words of nullity."

This declaration would doubtless have been more than persuasive with our territorial courts as interpretative of our statutes. It is also significant that with such controlling decisions extant the territorial Legislature took no steps to incorporate into our statutes express words of nullity of marriage not celebrated in accordance with statutory directions.

We have seen that our Legislature has declared certain marriages void and others invalid, and is silent as to others. It is not claimed in the case at bar that the facts bring the case within any such prohibited marriages as are expressly declared to be void or invalid. In this situation, I think the argument of the Rhode Island Supreme Court in Holgate v. United Electric Rys. Co. (1926) 47 R. I. 337, 133 A. 242, 243, is strongly persuasive. It was there said: "The Legislature could have declared such marriages void the same as it has declared marriages of persons within certain specified degrees of kindred void."

The fact that under two situations our Leg-

islature declared marriages void or invalid, and were silent as to the effect of nonobservance of certain other provisions of the statutes, strongly indicates the legislative intent that such nonobservance does not have the effect to invalidate such marriages.

Section 87-101, Comp. St. 1929, declares: "Marriage is contemplated by the law as a civil contract, for which the consent of the contracting parties, capable in law of contracting, is essential."

In 18 R. C. L. Marriage, § 17, it is said: "The general rule is that statutes which direct that a license must be issued and procured, that only certain persons shall perform the ceremony, that a certain number of witnesses shall be present, and that a certificate of the marriage shall be signed, returned and recorded, and that persons violating the conditions shall be guilty of a criminal offense, are addressed to persons in authority to secure publicity, and to require a record to be made of marriage contracted. * * * The record required to be made also furnishes evidence of the status and the legitimacy of the offspring of the marriage. Such statutes also accommodate the views of those who do not believe in marriages by contract simply, and would not be satisfied with entering into the marriage relation except by some mode prescribed by the statutes, and for the purpose of giving to the forms and ceremonies in practice among many classes statutory recognition."

As we have seen, some of our statutes, enacted as early as 1863, were designed to accomplish some of the purposes mentioned in the foregoing text, principally solemnization, publicity, and preservation of record information. The license statute of 1905 perfected, doubtless, the scheme by insuring uniformity of a system of records of marriages contracted, and otherwise strengthened it, but does not manifest any change of theory.

The great controversy has been usually as to whether a marriage entered into as a civil contract is valid without the attending celebration of religious ceremony.

We have observed that the statute relating to solemnization of the "contract of matrimony" is permissive in form. In Farmers' Dev. Co. v. Rayado L. & I. Co., 28 N. M. 357, 213 P. 202, we decided: "The power to construe a statute permissive in form as mandatory is exercised in proper cases by the courts; but it is a dangerous power and should be exercised with reluctance, but only in cases coming clearly within the recognized rules; or when the clear intent of the statute, as shown by the context, demands such construction."

As I understand the majority, they find no fault with the reasoning I have presented down to this point. In the conclusion I reach they could concur, except for one consideration, namely, "The legal and social history of this state is so different from that of most states that the majority doctrine does not fit our case." It is interesting to note that our neighboring jurisdictions of Texas, Louisiana, Arizona, and California early held common-law marriages valid, and that in these localities the legal and social history was to a degree like ours. I take it that we are chiefly

concerned with the legal history because social history is usually reflected therein.

I gather from the majority opinion that because at the time of the American military occupation of a large territory formerly under the sovereignty of Spain and Mexico and for many years thereafter the population of that territory was "largely Spanish-speaking, Spanish-thinking, Catholic in religion," "consensual marriages" were void in that domain.

Since the majority invoke the declaration by General Kearney in 1846 that, "All laws heretofore in force in this territory, which are not repugnant to, or inconsistent with the constitution of the United States and the laws thereof, or the statute laws in force for the time being, shall be the rule of action and decision in this territory" (Comp. Laws 1897, p. 82), it is important to ascertain what laws pertaining to marriages and the validity thereof were "heretofore in force" when his declaration was made.

In a leading case, Fisher v. Fisher, 250 N. Y. 313, 165 N. E. 460, 61 A. L. R. 1523, the New York Court of Appeals in 1929 held that: "A marriage on the high seas is valid where it is subject to no bar imposed by the common voice of Christendom, and, though no law which follows the ship sanctions it, no such law condemns it."

Because this able opinion of the judges touches closely upon our inquiry, I quote at length from it:

"In this action for a separation the complaint alleges 'that the parties hereto were duly married on the 24th day of October, 1925.' The answer denies the allegation. Concededly, on the day named the parties to the action were on board the steamship Leviathan, then on the high seas, bound from the port of New York to Southampton, England. When the ship was 40 miles out from the port of New York, its captain performed a marriage ceremony, wherein these parties were the principals. In the course of the ceremony the captain asked the plaintiff if she took the defendant for her husband, asked the defendant if he took the plaintiff for his wife, received an affirmative answer from each, and thereupon pronounced them man and wife. Cohabitation of the principals followed the ceremony. The ultimate question which survives for discussion here is this: Were the parties upon the occasion in question lawfully united in marriage?

"It is elementary that marriage is a civil contract; that the law deals with it as it does with all other contracts; that it pronounces a marriage to be valid wherever a man and woman, able and willing to contract, do, per verba de præsenti, promise to become husband and wife. Black Com. Sharswood, vol. 1, pp. 432–441; Kent's Com. vol. 2, p. 57; Clayton v. Wardell, 4 N. Y. 230; Ziegler v. P. Cassidy's Sons, 220 N. Y. 98, 115 N. E. 471, Ann. Cas. 1917E, 248; Meister v. Moore, 96 U. S. 76, 24 L. Ed. 826. A formal ceremony of marriage, whether in due form or not, must be assumed to be by consent, and, therefore, prima facie a contract of marriage per verba de præsenti. Fleming v. People, 27 N. Y. 329. According to the common law of all Christendom, consensual marriages—i. e., marriages resting simply on consent per verba

de præsenti—between competent parties, are valid marriages. Wharton's Conflict of Laws, §§ 171–173. 'This view prevailed and may be said to have been the common law of Christendom, as it had been of the old Roman Empire, down to the Council of Trent.' Maitland Select Essays in Anglo-American Legal History, vol. 3, p. 810. The canon law declared a valid marriage existed where competent parties should covenant, 'ego te accipio in meam,' and 'ego te accipio in meum.' Wharton, § 171. Consensual marriages were valid in England, Scotland, the Netherlands, *Spain*, Portugal, Germany, and the United States. Wharton, §§ 172–183. 'Marriage is a thing of right, recognized in all countries, in all ages, among all people, all religions, all philosophies. It pertains, therefore, in the highest sense, to the law of nations, in distinction from the law of any particular state or country.' Bishop on Marriage and Divorce, vol. 1, § 351. Marriage between parties capable of contracting is 'of common right, and valid by a common law prevailing throughout Christendom.' Hutchins v. Kimmell, 31 Mich. p. 126, 18 Am. Rep. 164. This common right, or common law, does not extend to marriages which are polygamous or incestuous. Bishop, § 375. The sanction which the law of civilized nations bestows upon marriages by mere consent is of course not inclusive of marriages which civilization commonly condemns. Hutchins v. Kimmell, supra, at page 134, of 31 Mich., 18 Am. Rep. 164. Otherwise, regulations restrictive of the common right of marriage by mere consent, or imposing conditions upon it, are exceptional; they depend upon local statutes, and, as in other cases of exceptions, if one claims that a case falls within them, the burden is upon him to show the fact. 'Prima facie a good marriage is shown when the contract is proved with cohabitation following it, and we cannot assume that there are regulations restrictive of the common right until they are shown.' Per Cooley, J., in Hutchins v. Kimmell, supra. Every presumption lies in favor of the validity of a marriage. Bishop, vol. 1, § 13; Piers v. Piers, 2 H. L. Cas. (Eng.) 331, 9 Eng. Rul. Cas. 1118; Hynes v. McDermott, 91 N. Y. 451, 43 Am. Rep. 677. Marriage between the parties to this action was not subject to any bar imposed by the common voice of Christendom. Consequently, although no law of any state, territory or district of the United States, *sanctioning* the marriage of the parties to this action, may have followed the ship Leviathan upon the high seas, in the absence of any such law which *condemned* the marriage, we think that they were lawfully married. It becomes necessary now to inquire whether a controlling law of any state did condemn the marriage."

Instead of striving to sustain a suggestion that the law of Mexico was contrary to the "common law of Christendom," we ought to assume that it was conformable thereto unless it is clearly shown to have been to the contrary.

The only thing to go on to the contrary is that *perhaps* the Council of Trent had been extended by the spanish monarch to Spain's American colony of Mexico.

We have the statement of the United States

Supreme Court in Hallett et al. v. Collins, 10 How. 174, 13 L. Ed. 376, decided in 1850 (about the time of American military occupation of New Mexico) that:

"In order to constitute a valid marriage in the Spanish colonies, all that was necessary was that there should be consent joined with the will to marry.

"The Council of Trent, in 1563, required that marriage should be celebrated before the parish or other priest, or by license of the ordinary and before two or three witnesses. This decree was adopted by the king of Spain in his European dominions, but not extended to the colonies, in which the rule above mentioned, established by the Partidas, was permitted to remain unchanged."

Professor Thayer of Harvard Law School, an eminent authority on the civil law, thinks this statement as an historical fact is erroneous. But it is fair to say that the territorial Supreme Court would have accepted it, and such would have been the rule here if a case had arisen and come to this court prior to statehood.

Since "a man who contracts in a country, engages for a competent knowledge of the law of contracts in that country," I think it fair to say that those entering into contracts of marriage in New Mexico would have the right to and ought not to be penalized for relying upon the decisions of our highest court. This sort of argument has been employed by the courts also. For instance, the Texas courts, as noted in the L. R. A. annotation hereinafter quoted, argued that as the statutes on marriage were substantially like those which prevailed in most states; and that, in as much as in such states the statutes were construed as not abrogating the common law (or the common law of Christendom) the Texas Legislature must be deemed to have taken them with that construction. It has also been argued that when settlers in a new territory come from various common-law states, it is proper for the court to consider that they may have brought their preconceived notions of law with them, and if they have unwittingly entered into contracts which were valid according to the customs of the people there residing, that these contracts ought not to be declared by the courts to be invalid unless they were plainly so.

In Patton v. Philadelphia & New Orleans, 1 La. Ann. 98, the court held to the same view as the Supreme Court of the United States and declared that an informal marriage in states which had derived their law from Spain was valid.

I now approach the matter from a different angle. Suppose the Supreme Court of the United States was mistaken and that Professor Thayer is correct in saying that: "The law of the Spanish colonies at any rate *in theory* did not recognize informal marriages after 1563."

The civil law including the law of Spain prior to 1563 recognized marriage as "contemplated by law as a civil contract."

The Council of Trent repudiated that and declared that a marriage not celebrated before a priest of the Catholic Church and before two or more witnesses was null and void.

From Dalrymple v. Dalrymple, 2 Hagg. Cons. 54, in which the U. S. Supreme Court in Hallett et al. v. Collins, supra, said was collected "all the learning upon this subject," I draw the following interesting observations:

"Marriage, in its origin, is a contract of natural law; it may exist between two individuals of different sexes, although no third person existed in the world, as happened in the case of the common ancestors of mankind. It is the parent, not the child, of civil society, 'Principium urbis et quasi seminarium reipublicae'. Cic. de Off. 1, 17. In civil society it becomes a civil contract, regulated and prescribed by law, and endowed with civil consequences. In most civilised countries acting under a sense of the force of sacred obligations, it has had the sanctions of religion superadded. It then becomes a religious, as well as a natural and civil contract; for it is a great mistake to suppose that, because it is the one, therefore it may not likewise be the other. Heaven itself is made a party to the contract, and the consent of the individuals, pledged to each other, is ratified and consecrated by a vow to God. It was natural enough that such a contract should, under the religious system which prevailed in Europe, fall under ecclesiastical notice and cognisance, with respect both to its theological and its legal constitution; though it is not unworthy of remark that, amidst the manifold ritual provisions made by the Divine Lawgiver of the Jews for various offices and transactions of life, there is no ceremony prescribed for the celebration of marriage. In the Christian church marriage was elevated in a later age to the dignity of a *sacrament*, in consequence of its divine institution, and of some expressions of high and mysterious import respecting it contained in the sacred writings. The law of the Church, the canon law (a system which, in spite of its absurd pretensions to a higher origin, is in many of its provisions deeply enough founded in the wisdom of man), although, in conformity to the prevailing theological opinion, it reverenced marriage as a sacrament, still so far respected its natural and civil origin, as to consider, that where the natural and civil contract was formed, it had the full essence of matrimony without the intervention of the priest. It had even in that state the character of a sacrament; for it is a misapprehension to suppose that this intervention was required as matter of necessity, even for that purpose, before the Council of Trent. It appears from the histories of that council, as well as from many other authorities, that this was the state of the earlier law, till that council passed its decree for the reformation of marriage. The consent of two parties expressed in words of present mutual acceptance, constituted an actual and legal marriage, technically known by the name of Sponsalia per verba de præsenti improperly enough, because sponsalia, in the original and classical meaning of the word, are preliminary ceremonials of marriage, and therefore Brower justly observes, Jus pontificium nimis laxo significatu, imo etymologia invita ipsas nuptias sponsalia appellavit. The expression, however, was constantly used in succeeding times to signify clandestine marriages, that is, marriages unattended by the prescribed

ecclesiastical solemnities, in opposition, first, to regular marriages; secondly, to mere engagements for a future marriage, which were termed sponsalia per verba de futuro, a distinction of sponsalia not at all known to the Roman civil law. Different rules, relative to their respective effects in point of legal consequence, applied to these three cases,—of regular marriages, of irregular marriages, and of mere promises or engagements. In the regular marriage everything was presumed to be complete and consummated both in substance and in ceremony. In the irregular marriage everything was presumed to be complete and consummated in substance but not in ceremony; and the ceremony was enjoined to be undergone as matter of order. In the promise, or sponsalia de futuro, nothing was presumed to be complete or consummate either in substance or ceremony.

"Mutual consent would release the parties from their engagement; and one party, without the consent of the other, might contract a valid marriage, regularly or irregularly, with another person; but if the parties who had exchanged the promise had carnal intercourse with each other, the effect of that carnal intercourse was to interpose a presumption of present consent at the time of the intercourse, to convert the engagement into an irregular marriage, and to produce all the consequences attributable to that species of matrimonial connection. I spare myself the trouble of citing from text-books of the canon law the passages that support these assertions. Several of them have been cited in the course of this discussion, and they all lie open to obvious reference in Brower and Swinburn, and other books that profess to treat upon these subjects. The reason of these rules is manifest enough. In proceedings under the canon law, though it is usual to plead consummation, it is not necessary to prove it, because it is always to be presumed in parties not shown to be disabled by original infirmity of body. In the case of a marriage per verba de praesenti, the parties there also deliberately accepted the relation of husband and wife, and consummation was presumed as naturally following the acceptance of that relation, unless controverted in like manner. But a promise per verba de futuro looked to a future time; the marriage which it contemplated might perhaps never take place. It was defeasible in various ways; and, therefore, consummation was not to be presumed; it must either have been proved or admitted. Till that was done, the relation of husband and wife was not contracted; it must be a promise cum copula that implied a present acceptance, and created a valid contract founded upon it.

"Such was the state of the canon law, the known basis of the matrimonial law of Europe. At the Reformation, this country disclaimed, amongst other opinions of the Romish Church, the doctrine of a *sacrament* in marriage, though still retaining the idea of its being of divine institution in its general origin; and on that account, as well as of the religious forms that were prescribed for its regular celebration, an holy estate, holy matrimony, but it likewise retained those rules of the canon law which had their foun-

dation not in the sacrament, or in any religious view of the subject, but in the natural and civil contract of marriage."

For the purposes of this consideration then I think we may assume that if the provisions of the Council of Trent relating to marriages was in force in Mexico at the time of the American military occupation of a portion thereof, we must look upon it as having the force of a statute declaring marriage to be a sacrament as distinguished from a civil contract of the parties; that if the sacrament was not celebrated before a priest and before two or more witnesses it was null and void.

Whether a priest of any other than the Catholic Church would suffice under the Council is not clear, but I assume not. It also seems certain that a civil magistrate would not meet the requirements of the Council.

If that was the law "in force in this territory" at the time of the military occupation in 1846, what change, if any, occurred thereafter? I think it fair to assume that most of those who came in from other states were familiar with the idea of marriage as a civil contract, and that present consent of the contracting parties to enter into the marriage state was sufficient to effectuate a marriage.

If a judicial inquiry had arisen after the decision of the Supreme Court of the United States in 1850 and prior to the earliest enactment by the territorial Legislature at the 1859–60 session (page 120) the answer as to whether a common-law marriage was valid in New Mexico would doubtless have been that the Council of Trent was not in force here, and there being no territorial statutes on the subject, and though the common law had not been specifically adopted by the Legislature, the marriage would be valid under "the common law of all Christendom," as defined in Fisher v. Fisher, supra.

The 1859–60 session of the Legislature recognized marriage as a "contract." This was contrary to the idea of the Council of Trent.

"At the Reformation, this country (England) disclaimed amongst other opinions of the Romish Church the doctrine of *sacrament* in marriage, though still retaining the idea of its being of divine institution in its general origin; and on that account, as well as of the religious forms that were prescribed for its regular celebration, an holy estate, holy matrimony, but it likewise retained those rules of the canon law which had their foundation not in the sacrament, or in any religious view of the subject, *but in the natural and civil contract of marriage.*" Dalrymple v. Dalrymple, 2 Hagg. Cons. 66, 17 Eng. Rul. Cas. 11. (Italics supplied.)

That Legislature did not believe that this contract of marriage could only be properly solemnized by a priest. Likewise, they did not fancy the idea that "consensual marriages" were null and void. All of this they manifested by the enactment of Laws 1859–60, p. 120. Section 87-102, Comp. St. 1929. That enactment follows: "It shall be lawful, valid and binding, to all intents and purposes, for those who may so desire, to solemnize *the contract* of matrimony by means of any ordained clergyman whatsoever, without re-

gard to the sect to which he may belong, or by means of any civil magistrate."

Thus, the provisions of the Council of Trent pertaining to marriage *if it were in force* in the conquered territory were repealed by this enactment. This is shown because:

First. The idea that marriage is a contract between the parties and not a sacrament was repugnant to the Council.

Second. No longer was the sanction of the priest of a particular sect necessary. There is no mandate that the contract be solemnized at all, but if it is, "any ordained clergyman * * * or any civil magistrate" will do.

Third. They left out any reference to the effects of failure to have solemnization of the contract. In Lewis' Sutherland Statutory Construction (2d Ed.) at page 459, it is said: "Laws are presumed to be passed with deliberation, and with a knowledge of all existing laws on the same subject. If they profess to make a change, by substitution, of new for old provisions, a repeal to some extent is thus suggested, and the extent readily ascertained. Thus, amendment is frequently made by enacting that a certain section shall be so amended as "to read as follows:" then inserting the substituted provision entirely without specification of the change. *The parts of the former law left out are repealed.* This intention is manifest." (Citing cases.)

This statute, though repugnant to the Council of Trent, is conformable to the "Common law of all Christendom" and statutes such as this and those similar to section 87-101, Comp. St. 1929 et seq., enacted at the session of 1862–63, had usually been held to be directory and to not have the effect of rendering invalid consensual marriages. The legislators in 1859–60 and 1862–63 must be presumed to have had a knowledge of the decision of the United States Supreme Court in the Hallett Case in 1850 to the effect that the Council of Trent was not in force in Spanish dominions, and they manifested no inclination to incorporate its provisions relating to marriage into their enactments.

Furthermore, in Field v. Otero, 35 N. M. 68, 290 P. 1015, we held that: "The act of the Legislature of 1876 (Code 1915, § 1354, Comp. 1929, § 34—101) adopting the common law as the rule of practice and decision in this jurisdiction abrogated the civil law of Mexico, theretofore existing here; only such portions thereof as have been enacted into statute remaining."

By no stretch of the imagination can it be said that the provisions of the Council of Trent were ever enacted into the territorial statutes.

This is further borne out in Beals v. Ares, 25 N. M. 459, 185 P. 780, 781, showing that where *statutes* enacted in this territory after the conquest were "patterned after the civil law," we would look to the civil law for the purpose of interpreting and expounding the statutes, "but provisions of the civil law on the subject *not incorporated into the statutes are not in force in this* jurisdiction."

Not only were the provisions of the Council of Trent not incorporated into our marriage statutes, but they were manifestly omitted therefrom.

I think these holdings completely dispose of the Council of Trent after 1859–60 and 1862–63 sessions of the Legislature, and particularly after the adoption of the common law in 1876. In the 1862–63 session, the Legislature held contra the Council of Trent, but declared more specifically: "Marriage is contemplated by the law as a civil contract, for which the consent of the contracting parties, capable in law of contracting, is essential. L. '62–'63, p. 64; C. L. '65, Ch. 75, § 2; C. L. '97, § 1415; Code '15, § 3425." Comp. St. 1929, § 87-101.

Even before 1876 the statutes ought to be interpreted in the light of the common law of Christendom, if not, the common law of the United States. After the adoption of the common law in that year, that law governed unless in conflict with our statute law.

In Bent v. Thompson, 5 N. M. 408, 23 P. 234, it was said that by the adoption of the common law as the basis of jurisprudence for the territory it was not intended thereby to repeal the statute laws, but only to adopt so much of the common law as did not conflict therewith. Since statutes like ours relating to marriage have generally been held not to repeal the common law of marriages, it cannot be said that the common law, when it was adopted here in 1876, was "in conflict" with the statutes, so it seems to me that as to a "consensual marriage" occurring after the adoption of the common law, we cannot say that we must ignore the common law and look to the statutes alone. The common law and the statutes abide side by side and are not in conflict. If it had

been considered that they were in conflict it seems likely that some legislation would have been enacted in the intervening period of more than half a century since the adoption of the common law to clear up such conflict.

This idea just advanced is supported in Beals v. Ares, supra: "When the Legislature in 1876 adopted the common law as the rule of practice and decision, the whole body of that law, as limited in the case of Browning v. Estate of Browning, 3 N. M. 659, 9 P. 677, came into this jurisdiction. Where it found a statute counter to its provisions, it yielded to the statute, but it gave way only in so far as the statute conflicted with its principles. In so far as was possible it operated in conjunction and harmony with the statutes. If the statutes conflicted with it, it bided its time, and upon repeal of the statute became again operative."

The argument employed by the majority to the effect that "absence of records of this court is evidence that the people have accepted the course of legislation as defining and limiting the essentials of a valid marriage" to my mind is not impressive. The contra might be argued. But aside from that, while there has been no decision of this court, this writer recalls that the question was in the offing in at least two workmen's compensation cases since he became a member of this court, but the point did not reach us for decision.

Furthermore, in the absence of decisions from this court, the state's highest law officers, the Attorney Generals, have expressed

opinions that common-law marriages are valid in New Mexico.

On February 21, 1914, Hon. H. S. Clancy, Assistant Attorney General, rendered an opinion (No. 1162), a portion of which is as follows:

"Section 1414 of the Compiled Laws of 1897 makes it lawful to all intents and purposes 'for those who may so desire' to solemnize the contract of matrimony by means of any ordained clergyman, or by means of any civil magistrate. Section 1415 of the same compilation defines marriage as a civil contract, for which the consent of the contracting parties, capable in law of contracting, is essential. From the foregoing, you will see that it is not absolutely essential that a man and woman, who desire to enter into a marriage contract, should have the same solemnized by a minister of the gospel or a justice of the peace, but 'those who may so desire' can employ the services of a clergyman or civil magistrate.

"The fact that the justice of the peace to whom you refer, at the time of the performance by him of a marriage ceremony, had failed to file his bond as required by law, will in no way vitiate the marriage contract or render the same void. I assume that any such marriage ceremonies performed by him were so performed by virtue of the license required by our statute, and such celebrations of marriages are now of record in the county clerk's office. In case a question should ever arise as to the legality of such a marriage, this record could be produced as evidence thereof, but even in the event that there had never been any record made, the marriage could still be proved by witnesses other than the so-called officer or by himself.

"In the case of Holder v. State [35 Tex. Cr. R. 19] 29 S. W. 793, it was set up by Holder and proved by him, that a marriage ceremony was performed between him and one Rosa Cleveland by a person named Roberts, who was not an ordained minister of the gospel at the time he performed such marriage ceremony. This fact being established, the contention was made that the marriage was a nullity. The Supreme Court of Texas very wisely took an opposite view and in its opinion made use of the following language in referring to statutes similar to ours: 'Such statutes are merely directory. Marriage is a civil contract, and is a thing of common right, so recognized by all civilized countries in all ages, and is encouraged by public policy. A rule of construction as contended for by appellant would bastardize children whose parents believed they were legally married, and who were not conscious of violating any law, human or divine, and who believed they had entered into the marital relation without coming in conflict with the provisions of statutory enactments. Such a rule, we think, fraught with consequences fearful to the interest of society, would tend to flood the courts with litigation, unsettle property rights, and disturb settled rights of inheritance. We cannot agree to such a rule of construction. Our statute does not render null or prescribe penalties against marriages not entered into under terms thereof.' "

The opinion proceeds with a quotation from the opinion of the United States Supreme Court in Meister v. Moore, supra, some of which I have quoted, and concludes that: "It is undoubtedly a fact that what are known as common law marriages are valid in this state."

This was followed in the same year by an opinion of Attorney General Frank Clancy addressed to the Assistant Commissioner of Indian Affairs, in which he says: "In the absence of any judicial decision it would not be safe to express any very positive opinion on this subject."

However, on March 8, 1915, in opinion No. 1464, Attorney General Frank Clancy without qualification expressed the opinion that common-law marriages are valid in New Mexico. The following is a quotation from the opinion: "Under Section 1414 of the Compiled Laws of 1897, it is declared merely that it shall be lawful, to all intents and purposes, for those who may so desire to solemnize the contract of matrimony by means of any ordained clergyman, or by means of any civil magistrate. The next preceding section declares that marriage is contemplated by law as a civil contract. There being no statute which declares marriages to be invalid if not celebrated by a clergyman or a civil magistrate, it follows that what are known as common law marriages, without the intervention of any clergyman, or magistrate, would be valid. Therefore, it does not seem necessary to consider the effect of this convict having officiated in marriage ceremonies, or whether parties married by him are lawfully married. If the parties to the marriage consent and agree to the civil contract, which our statute says that marriage is, they are perfectly well married."

This was followed by Attorney General Clancy on October 12, 1916, by another opinion to the same effect as the foregoing.

On March 5, 1930, Attorney General Otero thought the matter in doubt.

On February 15, 1921, Attorney General H. S. Bowman rendering an opinion to L. A. Lawler, Associate Counsel of the Bureau of War Risk Insurance, advised:

"The law governing marriage appears in Section 3426, Code 1915 wherein it is provided that it shall be lawful to solemnize the contract of matrimony by means of any ordained clergyman whatsoever. Nothing further upon the subject appears in our statutes. There is no requirement that the marriage ceremony should be performed by a clergyman or magistrate, and, therefore, it is our opinion that common law marriages are valid in this state.

"The section above mentioned was adopted by the territorial legislature in 1860 and, therefore, common law marriages have been legal in New Mexico since that date."

It seems to me that in view of the fact that whenever the state's chief law officers when giving an unqualified opinion upon several occasions ruled that common-law marriages were valid in New Mexico, it can hardly be said that the contrary view generally prevailed among the people.

"In Marriage and the State" (1929), a treatise by Richmond and Hall, the authors

express the opinion that common-law marriages are valid in New Mexico.

The territorial Supreme Court in Territory v. Harwood, 15 N. M. 424, 110 P. 556, 29 L. R. A. (N. S.) 504, brought out the fact of the legislative solicitude that even those entering into certain marriages which were forbidden and hence said to be void, should not necessarily be deemed to have been guilty of concubinage, and their children born of such forbidden marriage bastards, and therefore had provided that such forbidden marriages should be declared void only by a decree of court.

How then are we called upon to visit such harsh consequences upon those who may during past years have entered into consensual marriages (which are not in terms forbidden) and upon their children?

The rule of construction contended for by appellee as the Supreme Court of Texas said in Holder v. State, cited by Assistant Attorney General Clancy: "would bastardize children whose parents believed they were legally married, and who were not conscious of violating any law, human or divine, and who believed they had entered into the marital relation without coming in conflict with the provisions of statutory enactments. Such a rule, we think, fraught with consequences fearful to the interests of society, would tend to flood the courts with litigation, unsettle property rights, and disturb settled rights of inheritance."

I cannot agree to such a rule of construction.

SADLER, Justice (specially concurring in dissent).

Throughout our consideration of this appeal we have all been concerned to know, for such effect as it might properly have upon the question presented, what applicable laws, if any, came down to us from the days of Spanish and Mexican sovereignty. In other words, were the provisions of the Council of Trent, with their attendant condemnation of consensual marriages, in force in New Mexico at the time of American occupation? If so, the influence of this historic fact upon the question before us?

Professor J. B. Thayer, who teaches Roman and Civil Law in Harvard Law School and is possessed of special knowledge upon the subject, as a friend of the court, submitted his views upon this abstruse historical question in a memorandum for which we express our appreciation. We have his consent to quote the same reading as follows: "A marriage by mere consent without public ceremonial was valid by the Canon or ecclesiastical law until the Council of Trent (1563). Before that date there had been much legislation in Spain, steadily increasing in severity, penalizing such marriages without rendering them void. These culminated in a decree of Ferdinand in 1505 whereby the parties to such a marriage forfeited all their property, and were banished from Spain, the same being true of any witnesses. It should be noted that the phrase 'clandestine marriage' applies equally whether the contract is made with or without witnesses, the desideratum being the presence of a priest or state officer. An account of the

above mentioned statutes may be found in Friedberg (Emil), Recht der Eheschliessung, 71 ff. After much argument the Council of Trent pronounced 'clandestine' marriages to be void. In spite of the opinion of the U. S. Supreme Court in the Hallett case I can find no doubt whatever in the Spanish books as to the immediate and absolute effect of the provisions of this council in all the Spanish dominions. Spain was then the 'most Catholic country' engaged in upholding the Papacy everywhere, and the forms of marriage were then universally a question subject to the exclusive jurisdiction of the church. The Enciclopedia Jurídica Española, s. v Concilio de Trento (7.908), says that 'it is unnecessary to remark that the canons and decrees of the Council in so far as they had a general character had obligatory force in the Spanish church.' It adds that 'for greater assurance Philip the Second decreed that the Council's provisions should be "respected, accomplished, and executed" in the Spanish dominions.' This decree is to be found in the Novísima Recopilación, Lib. 1, tit. 1, ley. 13, which in the preamble speaks of our 'kingdoms, states, and seignories,' and later of 'these our kingdoms,' and addresses itself to 'the Archbishops, bishops, and other prelates, and the Generals, provincials, priors, guardians of the orders and all others concerned.' Moreover, of the arguments for the new régime made in the Council one was the abuse of the 'clandestine' marriage which had grown up in New Spain, see Cardenas, El matrimonio en sus relaciones históricas con el estado, p. 14 (extr. from the Revista de Es-

paña vol. 55). Friedberg, op. cit. 131 ff., notes that all the Latin American countries which have since dealt with the point incorporate the rule of the Council without question. Subsequent penalties for illicit marriages in Spanish law before the Code referred to the 'Indies and the islands' as a matter of course, cf. the final note to the 49th ley de Toro, in the 3ed of Llamas y Molina's commentary on the said laws. From all this I conclude that the law of the Spanish colonies at any rate in theory did not recognize informal marriages after 1563. The argument of the U. S. Supreme Court from the Recopilación de los Indios is not cogent, as that referred only to special colonial legislation and obviously did not attempt to reproduce the Spanish common law."

The authorities submitted and quoted by him to prove that the United States Supreme Court made a mistake in an historical fact in asserting in Hallett v. Collins, 10 How. 174, 13 L. Ed. 376, that the provisions of the Council of Trent relating to marriage were not put into effect in the Spanish dominions, quite satisfy my mind of the correctness of his conclusion. Nevertheless, New Mexico was then (1850) a territory. The United States Supreme Court was the highest court of review for such territory. From the time of that decision in 1850, certainly until statehood in 1912, the pronouncement of that court stood as the law of this territory and, as stated in the opinion of Mr. Justice BICKLEY, until corrected or changed would have been held decisive upon the same question arising in a case from this territory.

But, aside from this consideration, the reasoning of Mr. Justice BICKLEY, viz., that if the Council of Trent was ever in effect here, it was rendered innocuous as to its penalties by succeeding territorial legislation and by the judicial utterances of this court in Field v. Otero, and Beals v. Ares, declaring the extent to which the civil law has survived legislative efforts to deal with the same subject matter, are quite persuasive. I am unable to escape the force and logic of this reasoning.

Incidentally, the facts in the Hallett Case emphasize the far-reaching effect of the decision of the majority in the case at bar. In that case our highest tribunal had before it in 1850 the validity of a marriage contracted in 1811, nearly half a century before. In the Patton Case from Louisiana, cited both in the majority opinion and the dissenting opinion of Mr. Justice BICKLEY, the validity of a marriage antedating the opinion some 45 years was determined.

Furthermore, as reflected by inquiries reaching the office of the Attorney General of the state and of the territory, and as all must recognize, not infrequently a man and a woman who have contracted marriage in the best of faith, in attempted compliance with the letter of applicable governing statutes, have a doubt arise as to the validity of such marriage. Does the fact that the officiant at the marriage, though an ordained minister, was a convict, affect its validity (inquiry of Attorney General)? Is the marriage invalid because the officiating magistrate had not duly qualified by filing his bond, or taking his oath of office? Or, because he officiated outside his precinct or county? Or, because the minister was not duly ordained? Does the destruction by fire or otherwise of the official record of the marriage expose to question the relationship, if other proof of formal compliance with statutory regulations be wanting?

These, and as many other questions as fortuitous circumstance or failure to observe literally the performance of regulatory statutes can suggest, may arise to haunt and trouble the minds of wholly innocent couples who have dwelt together for years in the security of a conviction that a relationship thus sanctified by mutual consent, love, and confidence, furnished the substance, and compliance with statutory regulations the mere form, of validity. Has their relationship over the years been one of concubinage? Are the children born to them illegitimate?

This is not to intimate that correct legal opinion would dictate an affirmative answer to any of these inquiries. It is only to remind that such questions have arisen in the past and will arise in the future to plague and torment the lay minds of parties to marriages subject to any of said inquiries—parties wholly innocent of wrongdoing.

Until the pronouncement of the majority in the case at bar, the common-law marriage considered as a valid institution (and conceded by them as having the great weight of judicial authority in America to support it, even though the matter had never been formally decided by our territorial or state Supreme Court) has justifiably afforded a burying

ground for all such fears, apprehensions, and misgivings, real or imaginary. It can do so no longer.

For the Legislature in its wisdom and as a matter of state policy to enact that the right to contract a common-law marriage shall no longer exist is one thing. For us by judicial decision to say it never did exist is quite another. We are here declaring the state of the law in so far as it has been defined by statutory enactments and judicial decisions. Thus far those enactments have not by any word declared the common-law marriage void. But the Legislature has taken occasion to declare certain other marriages void. It should, I think, mark any change in a state of the law which trained legal minds, and a fortiori the lay mind, with abundant warrant may have felt to exist.

A legislative enactment would operate wholly prospectively. If our decision of the question had only such effect, it would not be fraught with such fateful consequences. It may even be conceded that some of the considerations which formerly argued so forcefully for the validity of the common-law marriage no longer exist. But the effect of the majority opinion is to say there never was a valid common-law marriage within the territorial confines of the territory (now state) of New Mexico. To that view, I cannot subscribe. The consequences which may attend such a holding are vividly portrayed in the language from Holder v. State, 35 Tex. Cr. R. 19, 29 S. W. 793, with which Mr. Justice BICKLEY closes his opinion.

I concur in his dissent.