AEDITA S. FISHER, Respondent, *v.* HARRY C. FISHER, Appellant.

(Argued January 9, 1929; decided February 13, 1929.)

*Charles E. Kelley* for appellant. No valid marriage of the plaintiff and the defendant was proved. (*Dye* v. *Dye*, 140 App. Div. 309; *Savage* v. *O' Neil*, 44 N. Y. 298; *Latham* v. *De Loiselle*, 3 App. Div. 525; 158 N. Y. 687;

*Liachovitzky* v. *New York Life Ins. Co.*, 126 Misc. Rep. 109; *Du Moulin* v. *Druit*, 13 Irish C. L. 213; *Norman* v. *Norman*, 121 Cal. 620; *Holmes* v. *Holmes*, 1 Abb. [N. S.] 525.)

*Charles H. Tuttle, Paul N. Turner* and *Emily Holt* for respondent. The appellant and respondent were legally married. (*International Navigation Co.* v. *Lindstrom*, 123 Fed. Rep. 475; *Meister* v. *Moore*, 96 U. S. 76; *Thorp* v. *Thorp*, 90 N. Y. 602; *Van Voorhis* v. *Brintnall*, 86 N. Y. 18; *Cunningham* v. *Cunningham*, 206 N. Y. 341.) The ceremony on the steamship *Leviathan* was celebrated outside the territory of New York State, and the captain was authorized by law and custom to perform it. Hence it is valid and binding as a ceremonial marriage. (*International Navigation Co.* v. *Lindstrom*, 123 Fed. Rep. 47ξ; *The Lake Monroe*, 250 U. S. 246; *Sloan Shipyards* v. *U. S. Shipping Board*, 258 U. S. 549; *U. S. Shipping Board* v. *Bauque Russo*, 286 Fed. Rep. 918; *The Havana*, 64 Fed. Rep. 496; *The Algonquin*, 88 Fed. Rep. 318.) In any event the marriage between the parties is valid as a marriage at common law. (*Canjolle* v. *Ferrie*, 23 N. Y. 90; *Leeds* v. *Joyce*, 202 App. Div. 696; 235 N. Y. 620; *Smith* v. *Smith*, 194 App. Div. 543; *Matter of Ziegler* v. *Cassidy's Sons*, 220 N. Y. 98; *Travers* v. *Reinhardt*, 205 U. S. 423; *Stewart* v. *Union Mutual Life Ins. Co.*, 155 N. Y. 257; *Crawford* v. *Chapman*, 17 Ohio, 449.)

KELLOGG, J. In this action for a separation the complaint alleges " that the parties hereto were duly married on the 24th day of October, 1925." The answer denies the allegation. Concededly, on the day named the parties to the action were on board the steamship *Leviathan*, then on the high seas, bound from the port of New York to Southampton, England. When the ship was forty miles out from the port of New York, its captain

performed a marriage ceremony, wherein these parties were the principals. In the course of the ceremony the captain asked the plaintiff if she took the defendant for her husband; asked the defendant if he took the plaintiff for his wife; received an affirmative answer from each; and thereupon pronounced them man and wife. Cohabitation of the principals followed the ceremony. The ultimate question for decision here is this: Were the parties upon the occasion in question lawfully united in marriage?

It is elementary that marriage is a civil contract; that the law deals with it as it does with all other contracts; that it pronounces a marriage to be valid wherever a man and woman, able and willing to contract, do, *per verba de presenti,* promise to become husband and wife. (Black Com. Sharswood, vol. I, p. 432–441; Kent's Com. vol. 2, p. 57; *Clayton* v. *Wardell,* 4 N. Y. 230; *Matter of Zeigler* v. *Cassidy's Sons,* 220 N. Y. 98; *Meister* v. *Moore,* 96 U. S. 76.) A formal ceremony of marriage, whether in due form or not, must be assumed to be by consent, and, therefore, *prima facie* a contract of marriage *per verba de presenti.* (*Fleming* v. *People,* 27 N. Y. 329.) According to the common law of all Christendom consensual marriages — *i. e.,* marriages resting simply on consent *per verba de presenti* — between competent parties, are valid marriages. (Wharton's Conflict of Laws, secs. 171–173.) "This view prevailed, and may be said to have been the common law of Christendom, as it had been of the old Roman Empire, down till the Council of Trent." (Maitland Select Essays in Anglo-American Legal History, vol. 3, p. 810.) The canon law declared a valid marriage existed where competent parties should covenant, "*ego te accipio in meam;*" and "*ego te accipio in meum.*" (Wharton, sec. 171.) Consensual marriages were valid in England, Scotland, The Netherlands, Spain, Portugal, Germany and the United States. (Wharton, secs. 172, 183.) "Marriage is a thing of right, recognized in

all countries, in all ages, among all people, all religions, all philosophies. It pertains, therefore, in the highest sense, to the law of nations, in distinction from the law of any particular state or country." (Bishop on Marriage & Divorce, vol. 1, sec. 351.) Marriage between parties capable of contracting is " of common right, and valid by a common law prevailing throughout Christendom." (*Hutchins* v. *Kimmell*, 31 Mich. p. 126.) This common right, or common law, does not extend to marriages which are polygamous or incestuous. (Bishop, sec. 375.) The sanction which the law of civilized nations bestows upon marriages by mere consent is of course not inclusive of marriages which civilization commonly condemns. (*Hutchins* v. *Kimmell*, *supra*, at p. 134.) Otherwise, regulations restrictive of the common right of marriage by mere consent, or imposing conditions upon it, are exceptional; they depend upon local statutes, and, as in other cases of exceptions, if one claims that a case falls within them, the burden is upon him to show the fact. " *Prima facie* a good marriage is shown when the contract is proved with cohabitation following it, and we cannot assume that there are regulations restrictive of the common right until they are shown." (Per COOLEY, J., in *Hutchins* v. *Kimmell*, *supra*.) Every presumption lies in favor of the validity of a marriage. (Bishop, vol. 1, sec. 13; *Piers* v. *Piers*, 2 H. L. Cas. 331; *Hynes* v. *McDermott*, 91 N. Y. 451.) Marriage between the parties to this action was not subject to any bar imposed by the common voice of Christendom. Consequently, although no law of any State, territory or district of the United States, *sanctioning* the marriage of the parties to this action, may have followed the ship *Leviathan* upon the high seas, in the absence of any such law, which *condemned* the marriage, we think that they were lawfully married. It becomes necessary now to inquire whether a controlling law of any State did condemn the marriage.

The defendant, prior to the performance of the marriage

ceremony in question, was already a married man. His former wife had procured, in this jurisdiction, a decree of divorce against him, dissolving the marriage on the ground of adultery. According to the terms of the decree, and the laws of this State, the defendant was forbidden to remarry during the life of his then wife. The wife, who procured the decree, is still living. It is well settled that the provisions of our statute forbidding the remarriage of a party who has been divorced for adultery have no extraterritorial effect; that a subsequent marriage of the guilty party, during the life of the innocent party, in a sister State, if valid in that State, will be recognized here as a lawful marriage. (*Moore* v. *Hegeman*, 92 N. Y. 521.) The question then arises, did the laws of the State of New York follow the steamship *Leviathan* in its journey upon the high seas?

"The Steamship Leviathan of New York, N. Y." was registered in the port of New York. The certificate of registry specifies that the "United States of America represented by the United States Shipping Board is the only owner of the vessel called the Leviathan of New York, N. Y." On the high seas it flew the flag of the United States. A ship in the open sea is regarded by the law of nations as a part of the territory whose flag such ship carries. (Wharton, Conflict of Laws, sec. 356.) Wharton says: "As between the several states in the American Union, a ship at sea is presumed to belong to the state in which it is registered." For this statement the sole authority is *Crapo* v. *Kelly* (16 Wall. [U. S.] 610). We think that the learned author misconceived the decision in that case. The ship there considered was a vessel owned by residents of the State of Massachusetts. It was, likewise, registered at a port within the State of Massachusetts. As we read the case, the court decided that the vessel was a Massachusetts ship, not because it had a Massachusetts registry, but because its owners were citizens of Massachusetts. The court said: "Again,

the owners of this vessel and the assignees in insolvency were citizens of Massachusetts, and subject to her laws. It is not doubted that a sale of property between them of property on board of this vessel, or of the vessel itself, would be regulated by the laws of Massachusetts." In *The Havana* (64 Fed. Rep. 496) it was held that a vessel owned by a New Jersey corporation, although registered in New York, was a New Jersey vessel. In *International Navigation Co.* v. *Lindstrom* (123 Fed. Rep. 475) it was said: " It is plain that the New York statute did not reach the case, because, inasmuch as the steamship belonged to a citizen of New Jersey, it was a vessel of that state, notwithstanding its registry in New York." To the same effect are *United States Shipping Board* v. *Greenwald* (16 Fed. Rep. [2d] 948) and *The Hamilton* (207 U. S. 398). In *Southern Pacific Co.* v. *Commonwealth of Kentucky* (222 U. S. 63) it was held that a vessel belonging to a Kentucky corporation was taxable in Kentucky although it was enrolled in the port of New York, had the name of New York painted on its stern, and never had been at any port in Kentucky. We think it clear, under the authorities, that the laws which follow a ship upon the high seas are the laws of the State where the owner resides, not the laws of the State within which the ship is registered. Therefore, if we assume that the United States was the owner of the steamship *Leviathan,* the laws of the State of New York did not follow the ship as a part of its territory, since the United States certainly is not domiciled in that State. The presumption of the validity of the marriage, therefore, was not destroyed by proof that one of the parties thereto, within the State of New York, was incompetent to marry.

We have hitherto assumed that the marriage in question had not the positive sanction of any Federal statute, or of the common law of any State, territory or district of the United States, carried upon the high seas by the steamship *Leviathan.* We think the fact is otherwise.

Congress had provided that "every vessel making voyages from a port in the United States to any foreign port " should have an official log book; that every master of such a vessel should make entry therein of " Every marriage taking place on board, with the names and ages of the parties." (Mason's U. S. Code, vol. 3, title 46, sec. 201.) " Every marriage taking place on board " is certainly inclusive of marriages other than those sanctioned by the municipal laws of the State of the ship's ownership. We take it that Congress had thus recognized that on board a ship at sea, notwithstanding the absence of municipal laws so carried, there is nevertheless a law of marriage. That law can be none other than the law, common to all nations, which pronounces valid all consensual marriages between a man and woman who are, in the view of all civilized people, competent to marry. In this view, the marriage between the parties to this action, by force of a Federal statute, which Congress was fully empowered to enact (*The Hamilton, supra*), was a valid marriage.

If the Federal statute cannot thus be interpreted, then we think that the common law of the District of Columbia prevailed to give sanction to the marriage. We have thus far assumed that the title to the steamship *Leviathan* was in the United States. The certificate of registry so states, and the referee has so found. Moreover, the respondent does not appear to have disputed the point. However, we think that such was not the fact. An act of Congress of June 5, 1920, provided in part as follows: " All vessels * * * acquired by the President * * * in pursuance of the joint resolution entitled ' Joint Resolution authorizing the President to take over for the United States the possession and title of any vessel within its jurisdiction, which at the time of coming therein was owned in whole or in part by any corporation, citizen, or subject of any nation with which the United States may be at war, or was under register of any such

nation, and for other purposes,' approved May 12, 1917, * * * are hereby transferred to the board * * *." (Mason's U. S. Code, vol. 3, title 46, chap. 24, sec. 863.) The " board " is the United States Shipping Board. The steamship *Leviathan* was a vessel of the class referred to by the joint resolution. In *Sloan Ship Yards Corp.* v. *U. S. Fleet Corp.* (258 U. S. 549, 566) Mr. Justice HOLMES, in referring to the act from which we have quoted, said: " Perhaps it is enough to add a reference to the Act of June 5, 1920, c. 250, 41 Stat. 988, 993, continuing the existence of the Fleet Corporation and its authority to operate vessels until all vessels are sold as directed by the act, § 11, but transferring the title to the Shipping Board." It seems to be clear, therefore, that the title to the steamship *Leviathan* was in the United States Shipping Board. That Board had its domicile in the District of Columbia. Therefore, if the law of Congress referred to did not occupy the field, the law of the District of Columbia in relation to marriage followed the steamship on its journey upon the high seas, and was controlling. ( *U. S. Shipping Board* v. *Greenwald*, 16 Fed. Rep. [2d] 948.) In that case the court said: " Since this steamship belonged to a citizen of the District of Columbia (The United States Shipping Board) it was a vessel of that District." In the absence of proof of the statutes of the District, we must assume that the common law, which would give sanction to the marriage in question, prevails in the District of Columbia; that this law obtained on board the steamship *Leviathan* when upon the high seas; that the marriage between the parties was, therefore, legal.

The judgment should be affirmed, with costs.

CARDOZO, Ch. J., POUND, CRANE, LEHMAN, O'BRIEN and HUBBS, JJ., concur.

Judgment affirmed.