[811 NYS2d 136]

Sylvia Samuels et al., Appellants, v New York State Department of Health et al., Respondents.

Third Department, February 16, 2006

10

## APPEARANCES OF COUNSEL

*Paul, Weiss, Rifkind, Wharton & Garrison, L.L.P.,* New York City (*Roberta A. Kaplan* of counsel), for appellants.

*Eliot Spitzer, Attorney General,* Albany (*Peter H. Schiff* of counsel), for respondents.

*Debevoise & Plimpton, L.L.P.,* New York City (*Troy A. McKenzie* of counsel), for Parents, Families & Friends of Lesbians and Gays, Inc. and others, amici curiae.

*Jenner & Block, L.L.P.,* Washington, D.C. (*William M. Hohengarten* of counsel), for American Psychological Association and others, amici curiae.

*Cravath, Swaine & Moore, L.L.P,* New York City (*Gary A. Bornstein* of counsel), for Empire State Pride Agenda and others, amici curiae.

*Willkie, Farr & Gallagher, L.L.P.,* New York City (*Martin Klotz* of counsel), for Women's Bar Association of the State of New York and others, amici curiae.

*Suzanne B. Goldberg,* New York City, for Professors of History and Family Law, amici curiae.

*Fried, Frank, Harris, Shriver & Jacobson, L.L.P.,* New York City (*Bonnie Steingart* of counsel), for Academy of Jewish Religion and others, amici curiae.

*Jay Weiser,* New York City, for Association of the Bar of the City of New York and others, amici curiae.

*Norman L. Reimer,* New York City, for New York County Lawyers' Association and another, amici curiae.

*Simpson, Thacher & Bartlett, L.L.P.,* New York City (*Joseph F. Tringali* of counsel), for Asian American Legal Defense and Education Fund and others, amici curiae.

*Robert E. Genant*, Mexico, for New York Family Policy Council, amicus curiae.

*Richard E. Barnes*, Albany (*Paul Benjamin Linton*, Northbrook, Illinois, of counsel), for New York State Catholic Conference, amicus curiae.

*Rena M. Lindevaldsen*, Longwood, Florida, for City Action Coalition and others, amici curiae.

*Byron Babione*, Scottsdale, Arizona, for Family Research Counsel, amicus curiae.

*James J. Duane*, Virginia Beach, Virginia, for National Legal Foundation, amicus curiae.

*William C. Duncan, Marriage Law Foundation*, Provo, Utah, for United Families International, amicus curiae.

## OPINION OF THE COURT

LAHTINEN, J.

Plaintiffs contend that the NY Constitution requires defendant State of New York to permit same-sex couples to marry.[1] Briefly stated, plaintiffs are same-sex couples,[2] some of whom assert that they requested a marriage license from a town clerk (*see* Domestic Relations Law § 15) and were informed that such licenses would not be issued to same-sex couples. It is also alleged in the complaint, and defendants admit, that defendant Department of Health determined that marriage licenses may

---

1. We note at the outset that several appellate courts in other jurisdictions have addressed a similar issue under their constitutions and, in some instances, the US Constitution. They have arrived at varying conclusions, often by divided votes (*see e.g. Lewis v Harris*, 378 NJ Super 168, 875 A2d 259 [2005]; *Morrison v Sadler*, 821 NE2d 15 [Ind 2005]; *Goodridge v Department of Pub. Health*, 440 Mass 309, 798 NE2d 941 [2003]; *Standhardt v Superior Ct. ex rel. County of Maricopa*, 206 Ariz 276, 77 P3d 451 [2003]; *Baker v State*, 170 Vt 194, 744 A2d 864 [1999]; *Dean v District of Columbia*, 653 A2d 307 [DC 1995]; *Singer v Hara*, 11 Wash App 247, 522 P2d 1187 [1974], *review denied* 84 Wash 2d 1008 [1974]; *Baker v Nelson*, 291 Minn 310, 191 NW2d 185 [1971], *appeal dismissed* 409 US 810 [1972]). In this state, the First Department recently held that maintaining the definition of marriage as being between one man and one woman does not violate the NY Constitution (*Hernandez v Robles*, 26 AD3d 98 [2005]) and, although it addressed the issue in a somewhat different context, the Second Department has indicated a similar conclusion (*Langan v St. Vincent's Hosp. of N.Y.*, 25 AD3d 90 [2005]; *Matter of Cooper*, 187 AD2d 128 [1993], *appeal dismissed* 82 NY2d 801 [1993]).

2. Although the facts relevant to the legal issues are succinct, we acknowledge the personal accounts of their various backgrounds that plaintiffs have set forth in the record. We do not question the sincerity of these accounts. However, a detailed recitation of plaintiffs' personal accounts in this decision is not necessary to address the legal issues before us.

not be issued to same-sex couples and the Department so advised city and town clerks throughout the state. In April 2004, plaintiffs commenced this action seeking a judgment declaring the Domestic Relations Law unconstitutional to the extent that it prohibits marriage licenses from being issued to same-sex couples. Plaintiffs assert that the statutory restriction violates the due process, equal protection and free speech provisions of the NY Constitution. After defendants answered, the parties moved for summary judgment. In December 2004, Supreme Court denied plaintiffs' motion, granted defendants' cross motion and dismissed the complaint. Plaintiffs appeal.

The Legislature has placed many parameters on marriage in New York (*see e.g.* Domestic Relations Law §§ 5, 6, 7). Historically, the role of defining the boundaries of marriage " 'has always been subject to the control of the Legislature' " (*Fearon v Treanor*, 272 NY 268, 272 [1936], quoting *Maynard v Hill*, 125 US 190, 205 [1888]) and, even though a particular judge or judges may disagree with the wisdom of some aspects of the restrictions, it is an area "left to the Legislature to resolve" (*Ferrin v New York State Dept. of Correctional Servs.*, 71 NY2d 42, 47 [1987]; *cf. Hope v Perales*, 83 NY2d 563, 575 [1994]). Nevertheless, if the Legislature runs afoul of well ingrained precepts of the Constitution, court intervention—no matter how unpopular[3]— is proper (*see e.g. Zablocki v Redhail*, 434 US 374 [1978]; *Loving v Virginia*, 388 US 1 [1967]). The hurdle for one attacking the constitutionality of laws duly enacted by the elected representatives of the people is high. "[L]egislative enactments are presumed valid and . . . one who challenges a statute bears the burden of proving the legislation unconstitutional beyond a reasonable doubt" (*Rochester Gas & Elec. Corp. v Public Serv. Commn. of State of N.Y.*, 71 NY2d 313, 319-320 [1988]; *see Matter of Travis S.*, 96 NY2d 818, 820 [2001]; *People v Foley*, 94 NY2d 668, 677 [2000], *cert denied* 531 US 875 [2000]; *Hope v Perales, supra* at 574-575). It is with this background in mind that we turn to plaintiffs' constitutional arguments.

---

3. "Just as judges should not shrink from carrying out the legislative will, so too should they not shrink from declaring statutes unconstitutional in proper cases, however distasteful that may be" (*People v LaValle*, 3 NY3d 88, 132 [2004] [Rosenblatt, J., concurring] [emphasis omitted]). Determining whether there is a conflict between an enacted law and the constitution is "of the very essence of judicial duty" (*Marbury v Madison*, 1 Cranch [5 US] 137, 178 [1803]). A court's role is not to merely conform to a majoritarian paradigm (*see generally* Chemerinsky, *The Vanishing Constitution*, 103 Harv L Rev 43 [1989]) and, when the high standard established for finding a statute unconstitutional is met, the statute must surcease regardless of its popularity.

We consider first plaintiffs' contention that substantive due process is violated by this State's statutes limiting marriage to one woman and one man. New York's Due Process Clause provides that "[n]o person shall be deprived of life, liberty or property without due process of law" (NY Const, art I, § 6).[4] Protection for certain fundamental rights is implicit within this crucial constitutional clause (*see Hope v Perales, supra* at 575 [1994]).[5] And, in an appropriate case, the protections provided by New York's Due Process Clause will be afforded a more expansive interpretation than the US Constitution (*see Sharrock v Dell Buick-Cadillac*, 45 NY2d 152, 159-160 [1978]; *see also People v LaValle*, 3 NY3d 88, 129 [2004]; *Cooper v Morin*, 49 NY2d 69, 79 [1979]). A law that impinges upon a fundamental right is subject to strict scrutiny, whereas one that does not "burden a fundamental right. . . is valid if it bears a rational relationship to [a governmental] interest" (*Hope v Perales, supra* at 577).

Courts use great caution when urged to recognize a new fundamental right or significantly expand an established one. The compelling reason for such caution was explained by the United States Supreme Court as follows:

"[W]e ha[ve] always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended. By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process

---

4. This language is similar to US Constitution, 14th Amendment, § 1, which states that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."

5. With regard to the US Constitution, rights not specifically set forth in the Bill of Rights, but found to be fundamental to the "liberty" element of due process, include those

"to marry, *Loving v. Virginia*, 388 U.S. 1 (1967); to have children, *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535 (1942); to direct the education and upbringing of one's children, *Meyer v. Nebraska*, 262 U.S. 390 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925); to marital privacy, *Griswold v. Connecticut*, 381 U.S. 479 (1965); to use contraception, *ibid.*; *Eisenstadt v. Baird*, 405 U.S. 438 (1972); to bodily integrity, *Rochin v. California*, 342 U.S. 165 (1952), and to abortion [*Planned Parenthood of Southeastern Pa. v*] *Casey*, [505 US 833 (1992)]" (*Washington v Glucksberg*, 521 US 702, 720 [1997]).

Clause be subtly transformed into the policy preferences of the Members of this Court" (*Washington v Glucksberg*, 521 US 702, 720 [1997] [internal quotation marks and citations omitted]).

One of the primary safeguards in maintaining a cautious and principled substantive due process analysis is the requirement that an asserted right or liberty generally be " 'deeply rooted in this Nation's history and tradition' " (*id.* at 721, quoting *Moore v East Cleveland*, 431 US 494, 503 [1977]). The Court of Appeals has explained that "[d]ue process of law guarantees respect for personal immunities 'so rooted in the traditions and conscience of our people as to be ranked as fundamental' " (*People v Isaacson*, 44 NY2d 511, 520 [1978], quoting *Snyder v Massachusetts*, 291 US 97, 105 [1934] [Cardozo, J.]). When, as here, the NY Constitution is asserted, it is appropriate to consider whether the history and traditions unique to this state point clearly to the need for additional protection beyond that afforded by the US Constitution (*see People v P.J. Video*, 68 NY2d 296, 303 [1986], *cert denied* 479 US 1091 [1987]).

Plaintiffs seek to bring the right to marry the person of their choosing regardless of gender within the protection of the well-recognized fundamental right to marry (*see Zablocki v Redhail*, 434 US 374 [1978], *supra*; *Loving v Virginia*, 388 US 1 [1967], *supra*; *Skinner v Oklahoma ex rel. Williamson*, 316 US 535, 541 [1942]). However, we find merit in defendants' assertion that this case is not simply about the right to marry the person of one's choice, but represents a significant expansion into new territory which is, in reality, a redefinition of marriage. The cornerstone cases acknowledging marriage as a fundamental right are laced with language referring to the ancient recognized nature of that institution, specifically tying part of its critical importance to its role in procreation and, thus, to the union of a woman and a man. In *Skinner v Oklahoma ex rel. Williamson* (*supra*), Justice Douglas, writing for the United States Supreme Court, stated that "[m]arriage and procreation are fundamental to the very existence and survival of the race" (*id.* at 541). Drawing upon *Skinner,* Chief Justice Warren penned in *Loving v Virginia* (*supra*) that "[m]arriage is one of the 'basic civil rights of man,' fundamental to our very existence and survival" (*id.* at 12). Justice Marshall, citing to *Skinner* and *Loving,* as well as other decisions of the Court, wrote in *Zablocki v Redhail*:

"Long ago . . . the Court characterized marriage as

the most important relation in life and as the foundation of the family and of society, without which there would be neither civilization nor progress . . . [T]he Court recognized that the right to marry, establish a home and bring up children is a central part of the liberty protected by the Due Process Clause . . . and . . . marriage was described as fundamental to the very existence and survival of the race" (*id.* at 384 [internal quotation marks and citations omitted]).

In a similar vein, the Court of Appeals has observed about marriage: "However much this relationship may be debased at times it nevertheless is the foundation upon which must rest the perpetuation of society and civilization" (*Mirizio v Mirizio*, 242 NY 74, 81 [1926]; *see Fearon v Treanor*, 272 NY 268, 271-272 [1936], *supra*; *Fisher v Fisher*, 250 NY 313, 316-317 [1929]; *see also Matter of Cooper*, 187 AD2d 128, 133-134 [1993], *appeal dismissed* 82 NY2d 801 [1993]).

■ To remove from "marriage" a definitional component of that institution (i.e., one woman, one man) which long predates the constitutions of this country and State (*see e.g. Griswold v Connecticut*, 381 US 479, 486 [1965])[6] would, to a certain extent, extract some of the "deep[ ] root[s]" that support its elevation to a fundamental right.[7] While such a change of a basic element of the institution may eventually find favor with the Legislature, we are not persuaded that the Due Process Clause requires a judicial redefinition of marriage. Accordingly, the Domestic Relations Law will survive plaintiffs' substantive due process challenge if it has a rational basis. Before we address that issue, we must determine whether the Equal Protection Clause mandates a higher level of scrutiny.

The NY Constitution's Equal Protection Clause provides, in pertinent part, that "[n]o person shall be denied the equal

---

**6.** In *Griswold v Connecticut* (*supra* at 486), the United States Supreme Court stated that "[w]e deal with a right of privacy older than the Bill of Rights—older than our political parties, older than our school system. Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred." Since *Griswold* spoke of marriage within the context of restrictions on contraceptives, it is apparent that the Court was referring to opposite-sex marriage (*id.* at 482 ["This law . . . operates directly on an intimate relation of husband and wife"]).

**7.** This is not to suggest that all aspects of marriage have or must remain mired in an inflexible mold. The legal rights of the parties to the relationship have changed (*see e.g. People v Liberta*, 64 NY2d 152 [1984], *cert denied* 471 US 1020 [1985]; *Millington v Southeastern El. Co.*, 22 NY2d 498 [1968]).

protection of the laws of this state or any subdivision thereof" (NY Const, art I, § 11).[8] The Court of Appeals has noted that "the State constitutional equal protection clause . . . is no broader in coverage than the Federal provision" (*Under 21, Catholic Home Bur. for Dependent Children v City of New York*, 65 NY2d 344, 360 n 6 [1985]; *see Matter of Esler v Walters*, 56 NY2d 306, 313-314 [1982]; *Brown v State of New York*, 9 AD3d 23, 27 [2004]).[9] "The general rule [in equal protection analysis] is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest" (*Cleburne v Cleburne Living Center, Inc.*, 473 US 432, 440 [1985] [citations omitted]). Rational basis review, however, gives way to strict scrutiny for classifications based on race, national origin or those affecting fundamental rights and to intermediate or heightened scrutiny for certain classifications such as gender and illegitimacy (*see Clark v Jeter*, 486 US 456, 461 [1988]; *Matter of Aliessa v Novello*, 96 NY2d 418, 430 [2001]). Plaintiffs urge that they should be declared a new suspect class entitled to at least intermediate level scrutiny and, also, that New York's marriage statutes create a gender-based discriminatory scheme.

As to the level of scrutiny regarding assertions of sexual orientation discrimination, we recently held, in *Matter of Valentine v American Airlines* (17 AD3d 38, 42 [2005]), as follows:

> "Courts, including the United States Supreme Court, have applied the rational basis standard, rather than strict or heightened scrutiny, when reviewing sexual orientation discrimination allegations (*see Romer v Evans*, 517 US 620, 631-633 [1996]; *Lofton v Secretary of Dept. of Children & Family Servs.*, 358 F3d 804, 818 [11th Cir 2004], *cert denied* [543] US [1081] [2005]; *Schroeder v Hamilton School Dist.*, 282 F3d 946, 950-951 [7th Cir 2002], *cert denied* 537 US 974 [2002]; *Under 21, Catholic Home Bur. for Dependent Children v City*

---

**8.** The Equal Protection Clause of the US Constitution 14th Amendment states that no state shall "deny to any person within its jurisdiction the equal protection of the laws."

**9.** Plaintiffs urge that in this case, New York's Equal Protection Clause should be interpreted more expansively than its federal counterpart. However, departure from such clear Court of Appeals' precedent must be left to that Court.

*of New York,* [*supra* at 364] [noting that courts have uniformly refused to apply higher level of scrutiny to sexual orientation discrimination]; *Matter of Cooper,* 187 AD2d 128, 133 [1993], *supra; Matter of Shields v Madigan,* [5 Misc 3d 901, 907 (2004)] [determining that rational basis existed for state law permitting only opposite-sex couples to marry])."

The doctrine of adhering to precedent is an important one (*see Baker v Lorillard,* 4 NY 257, 261 [1850] [Precedent should not be cast aside "unless impelled by *'the most cogent reasons'* "]; *see also Cenven, Inc. v Bethlehem Steel Corp.,* 41 NY2d 842, 843 [1977] ["(T)he doctrine of stare decisis should not be departed from except under compelling circumstances"]), and it is rooted in part in the "humbling assumption . . . that no particular court as it is then constituted possesses a wisdom surpassing that of its predecessors" (*People v Hobson,* 39 NY2d 479, 488 [1976]; *see* Cardozo, The Nature of the Judicial Process, at 149 [1921]). We recognize, however, that following precedent is not an absolutely rigid rule and "in cases interpreting the Constitution courts will . . . , if convinced of prior error, correct the error" (*People v Hobson, supra* at 488-489; *but cf. Planned Parenthood of Southeastern Pa. v Casey,* 505 US 833, 844, 854-855 [1992]). Nevertheless, after review of the arguments advanced in the current case, we are not persuaded to reconsider or depart from our recent holding in *Matter of Valentine v American Airlines (supra).*

Nor are we persuaded by plaintiffs' contention that the Domestic Relations Law discriminates on the basis of gender. In *Valentine,* we addressed an analogous assertion about the Workers' Compensation Law and held that, since that law

"is facially neutral and applies equally to males and females, we do not accept claimant's argument that [the statute] discriminates on the basis of gender (*see Baker v State,* 170 Vt 194, 215 n 13, 744 A2d 864, 880 n 13 [1999], and cases cited therein; *Matter of Shields v Madigan,* [*supra* at 906]; *but see Baehr v Lewin,* 74 Haw 530, 572, 852 P2d 44, 64 [1993] [based on state constitution])" (*Matter of Valentine v American Airlines, supra* at 41).

The same reasoning applies to the facially neutral Domestic Relations Law. Hence, the marriage laws will survive plaintiffs' equal protection claims—as well as their due process claims—unless they are unsupported by a rational basis.

"When reviewing using a rational basis standard, 'a classification must be upheld . . . if there is any *reasonably conceiv-*

*able* state of facts that could provide a rational basis for the classification . . . [I]ndeed, a court may even *hypothesize* the motivations of the State Legislature to discern any conceivable legitimate objective promoted by the provision under attack' " (*Dalton v Pataki*, 5 NY3d 243, 265-266 [2005], quoting *Port Jefferson Health Care Facility v Wing*, 94 NY2d 284, 290-291 [1999], *cert denied* 530 US 1276 [2000]). "Since the challenged statute is presumed to be valid, [t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it . . . *whether or not the basis has a foundation in the record*" (*Affronti v Crosson*, 95 NY2d 713, 719 [2001] [internal quotation marks and citations omitted]). Succinctly stated, "[t]he rational basis standard of review is a paradigm of judicial restraint" (*id.* [internal quotation marks and citations omitted]).

The interests urged as meeting the low threshold of a rational basis include, among others: preserving the historic legal and cultural understanding of marriage; recognizing heterosexual marriage as a social institution in which procreation occurs; and conforming with the current legal landscape nationwide. Certainly, the logic of each of these grounds is neither flawless nor finely tailored; however, it need not be. "[W]here rationality is the test, a State 'does not violate the Equal Protection Clause merely because the classification made by its laws are imperfect' " (*Massachusetts Bd. of Retirement v Murgia*, 427 US 307, 316 [1976], quoting *Dandridge v Williams*, 397 US 471, 485 [1970]; *see Lindsley v Natural Carbonic Gas Co.*, 220 US 61, 78 [1911]; *Goodwin v Perales*, 88 NY2d 383, 398 [1996]).

We consider first the preservation of the historic legal and cultural understanding of marriage. In *Lawrence v Texas* (539 US 558 [2003])—a case cited by plaintiffs throughout their arguments—Justice O'Connor stated in her concurring opinion that a "legitimate state interest" would include "preserving the traditional institution of marriage" (*id.* at 585). The majority in *Lawrence* was careful to explain that its decision did not involve "whether the government must give formal recognition to any relationship that homosexual persons seek to enter" (*id.* at 578). It is, indeed, a long legal road from finding a constitutionally based shield providing protection from criminal prosecution for certain adult consensual conduct carried out in private to using the Constitution as the means to redefine marriage.

While history and the collective wisdom of our ancestors should not be lightly set aside (*see Elk Grove Unified School*

*Dist. v Newdow*, 542 US 1, 38 [2004] [O'Connor, J., concurring]; *Washington v Glucksberg*, 521 US 702, 723 [1997], *supra*; *Jackman v Rosenbaum Co.*, 260 US 22, 31 [1922]; *New York Trust Co. v Eisner*, 256 US 345, 349 [1921] [Holmes, J.] ["a page of history is worth a volume of logic"]), there are nonetheless occasions when old paradigms must cease. A primary example of a justified break with the past is *Loving v Virginia* (388 US 1 [1967], *supra*), a case upon which plaintiffs place significant reliance. There are, however, critical legal and factual distinctions between *Loving* and the current case. For example, the law in *Loving* did not seek to redefine the historical understanding of marriage (*see Lewis v Harris*, 378 NJ Super 168, 190-191, 875 A2d 259, 272-273 [2005]; *Standhardt v Superior Ct. ex rel. County of Maricopa*, 206 Ariz 276, 283, 77 P3d 451, 458 [2003]; *see also Hernandez v Robles*, 26 AD3d 98, 113 [1st Dept 2005] [concurring op]), but instead involved a race-based barrier to a traditional one woman, one man union. *Loving* was, in many respects, about racial discrimination (*see Loving v Virginia, supra* at 11 ["There is patently no legitimate overriding purpose independent of invidious racial discrimination which justifies this classification"]). Race-based barriers strike at the heart of the Civil War amendments (*see Oregon v Mitchell*, 400 US 112, 126-127 [1970]; *see also Palmore v Sidoti*, 466 US 429, 432 [1984]) and are always subject to the strictest scrutiny. *Loving* implicated not only marriage, but did so with a barrier that was clearly subject to the highest level of scrutiny. That barrier was a direct descendant of the abhorrent conduct which was a cause of civil war in this nation and served as an impetus for several amendments to the US Constitution.

Here, after the recent efforts to redefine marriage received considerable publicity and some judicial support, the United States Congress passed, and President Clinton signed into law, the federal Defense of Marriage Act (*see* 1 USC § 7; 28 USC § 1738C), and nearly all state legislatures that have addressed the issue have similarly maintained the traditional definition of marriage (over 40 states have reportedly enacted statutes similar to the federal Defense of Marriage Act and many have amended their constitutions). In light of the recent statement of Justice O'Connor in *Lawrence v Texas* (539 US 558 [2003], *supra*), the expressed restraint of the majority in that case, and with due respect for history and elected representatives, we are not persuaded that plaintiffs have established beyond a reasonable doubt that it is irrational for the Legislature to preserve the historic legal and cultural understanding of marriage (*see Hernandez v Robles, supra* at 105).

Next, we address the further proffered rational basis—closely related to the prior one—of recognizing heterosexual marriage as a social institution in which procreation occurs. We start by accepting for purposes of this case the following observations (many, but not all, of which are not seriously disputed): precluding same-sex couples from marrying does not encourage opposite-sex couples to have and raise children; many same-sex couples currently raise children and both partners are good parents; the adoption of a child is not dependent upon a parent's sexual orientation or marital status; with the assistance of modern technology, conception of a child is possible outside of sexual intercourse and regardless of the woman's sexual orientation; and many opposite-sex couples who marry do not have children. In light of these observations, if the test being employed was not rational basis, the overinclusive and underinclusive nature of this basis would create considerable problems for defendants; a fact that defendants conceded at oral argument.

However, as previously stated, the test here is rational basis, where "distinctions may be made with substantially less than mathematical exactitude, and rationality is not impaired because a distinction is either over-inclusive or under-inclusive" (*Port Chester Nursing Home v Axelrod*, 732 F Supp 440, 447 [1990] [internal quotation marks and citations omitted]). It is an undisputed biological fact that the vast majority of procreation still occurs as a result of sexual intercourse between a male and a female. In light of such fact,

> "[t]he State could reasonably decide that by encouraging opposite-sex couples to marry, thereby assuming legal and financial obligations, the children born from such relationships will have better opportunities to be nurtured and raised by two parents within long-term, committed relationships, which society has traditionally viewed as advantageous for children" (*Standhardt v Superior Ct. ex rel. County of Maricopa, supra* at 287-288; *see Hernandez v Robles, supra* at 104, 105).

Stated another way:

> "One of the State's key interests in supporting opposite-sex marriage is not necessarily to encourage and promote 'natural' procreation across the board and at the expense of other forms of becoming parents, such as by adoption and assisted reproduction; rather, it encourages opposite-sex couples who, by definition, are the only type of

couples that can reproduce on their own by engaging in sex with little or no contemplation of the consequences that might result, i.e. a child, to procreate responsibly . . . The institution of opposite-sex marriage both encourages such couples to enter into a stable relationship before having children and to remain in such a relationship if children arrive during the marriage unexpectedly" (*Morrison v Sadler*, 821 NE2d 15, 25 [Ind 2005]; *see Hernandez v Robles, supra* at 123-124 [concurring op]).[10]

While the parties and amici have cited numerous studies by a host of authors and purported authorities, some of which affirm the premise of this rationale and some of which dispute it, the Legislature is the better forum for sorting through this type of conflicting data on an important social issue. We agree with the opinion of the First Department (*see Hernandez v Robles, supra*; *see also Langan v St. Vincent's Hosp. of N.Y.*, 25 AD3d 90 [2d Dept 2005]) and the majority of jurisdictions, which have found a rational basis for the historic definition of marriage (*see e.g. Lewis v Harris, supra*; *Morrison v Sadler, supra*; *Standhardt v Superior Ct. ex rel. County of Maricopa, supra*; *Matter of Nash*, 2003 Ohio 7221, 2003 WL 23097095, 2003 Ohio App LEXIS 6513 [2003]; *Dean v District of Columbia*, 653 A2d 307 [1995]; *Singer v Hara*, 11 Wash App 247, 522 P2d 1187 [1974], *review denied* 84 Wash 2d 1008 [1974]; *but see Goodridge v Department of Pub. Health*, 440 Mass 309, 798 NE2d 941 [2003]).[11] It is not necessary to discuss the other offered rational bases.

---

**10.** *See generally* Kmiec, *The Procreative Argument for Proscribing Same-Sex Marriage*, 32 Hastings Const LQ 653 (2004-2005); Stewart, *Judicial Redefinition of Marriage*, 21 Can J Fam L 11 (2004); Wardle, *"Multiply and Replenish": Considering Same-Sex Marriage in Light of State Interests in Marital Procreation*, 24 Harv JL & Pub Pol'y 771 (2001).

**11.** We note that an appeal of a lower court decision finding no due process or equal protection violation in the one woman, one man element of marriage was dismissed for want of substantial federal question by the United States Supreme Court in *Baker v Nelson* (291 Minn 310, 191 NW2d 185 [1971], *appeal dismissed* 409 US 810 [1972]; *see Morrison v Sadler, supra* at 19-20 [discussing precedential effect of the Supreme Court's dismissal]; *see also Matter of Cooper*, 187 AD2d 128, 134 [1993], *supra*). With regard to *Cooper*, the ground asserted by plaintiffs for rejecting *Cooper* as authority is the citation in that case to *Bowers v Hardwick* (478 US 186 [1986]), which was subsequently overruled in *Lawrence v Texas* (539 US 558 [2003], *supra*). *Cooper*, however, was decided after *People v Onofre* (51 NY2d 476 [1980]), in which the Court of Appeals struck down this State's statutes criminalizing adult consensual sodomy in a ruling that foreshadowed the United States Supreme Court's *Lawrence* decision. The Second Department adhered to

■ Lastly, we are unpersuaded by plaintiffs' argument that the relevant restrictions placed by New York on the issuing of marriage licenses violated plaintiffs' constitutional right to free speech[12] (*see Goodridge v Department of Pub. Health*, 14 Mass L Rptr 591, 2002 WL 1299135, *11-12, 2002 Mass Super LEXIS 153, *41-42 [2002], *revd on other grounds* 440 Mass 309, 798 NE2d 941 [2003]; *cf. Smelt v County of Orange*, 374 F Supp 2d 861, 867-868 [CD Cal 2005], and cases cited therein [when addressing the issue within the context of the federal jurisdiction abstention doctrine, observing that "(i)t is not readily apparent obtaining a marriage license is protected First Amendment activity"]). "It is possible to find some kernel of expression in almost every activity a person undertakes—for example, walking down the street or meeting one's friends at a shopping mall—but such a kernel is not sufficient to bring the activity within the protection of the First Amendment" (*Dallas v Stanglin*, 490 US 19, 25 [1989]). Stated another way, "[w]e cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' " (*United States v O'Brien*, 391 US 367, 376 [1968]). Such is the situation here. However, even if it is assumed that the Legislature's actions in fulfilling its long-established duty of defining the parameters of marriage (*see e.g. Fearon v Treanor*, 272 NY 268, 272 [1936], *supra*) implicated plaintiffs' rights under free speech protection, "when 'speech' and 'nonspeech' elements are combined . . . a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms" (*United States v O'Brien, supra* at 376; *see People v Hollman*, 68 NY2d 202, 206-207 [1986]). This State's laws defining marriage are general in nature and do not target any speech or expressive conduct. The Legislature acted consistent with its constitutional role, and the parameters that it placed on marriage are undergirded by sufficient governmental interests to uphold marriage as historically understood and defined. In our

---

its *Cooper* decision in the recent case of *Langan v St. Vincent's Hosp. of N.Y.* (*supra*).

12. The freedom of speech provision of the NY Constitution provides: "Every citizen may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press" (NY Const, art I, § 8).

opinion, the Legislature is where changes to marriage of the nature urged by plaintiffs should be addressed.[13]

CARDONA, P.J., MERCURE, CARPINELLO and MUGGLIN, JJ., concur.

Ordered that the order is affirmed, without costs.

---

**13.** In such regard, we note that gays and lesbians in New York have, in recent years, advocated and successfully obtained passage of a broad array of rights from the Legislature (*see e.g.* Civil Rights Law § 40-c [2]; Education Law § 313; Executive Law § 296; Insurance Law § 2701 [a]; Penal Law § 240.30 [3]; L 2002, chs 73, 467, 468).